Filed 10/3/23  Shaikh v. Tahir CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASIF AHMED SHAIKH et al., as Trustees, etc.,<br><br>    Plaintiffs and Appellants,<br><br>         v.<br><br>SYED TAHIR et al.,<br><br>    Defendants and Appellants. | G060057, G060111<br><br>(Super. Ct. No. 30-2019-01082289)<br><br>O P I N I O N |

Appeals from a judgment of the Superior Court of Orange County, Aaron W. Heisler, Temporary Judge (Pursuant to Cal. Const., art. VI, § 21); Kim R. Hubbard, Judge.  Reversed and remanded with directions.  Motion to augment the record granted.

Reich Radcliffe & Hoover and Adam T. Hoover for Plaintiffs and Appellants.

Khalil Ahmad for Defendants and Appellants.

The decision to reverse this case was difficult, but we must reverse it. Simply stated, we have no confidence Urdu-speaking Syed Tahir or the Center for Religious Tolerance, Inc. (Defendants) were given the benefit of a fair trial or equal access to justice. The record shows there were several contributing factors, some simply circumstantial, some created by trial tactics, and some arising from court error. When viewed together, these factors deprived Defendants of effective counsel during discovery disputes, which resulted in a type of terminating sanction/default judgment that we cannot affirm.

The underlying case arises from a heated legal battle over ownership of a house in Lemon Grove, California. On one side of the dispute are two brothers, Asif Ahmed Shaikh and Arif Usman Shaikh (collectively the Trustees unless context requires otherwise). They are the trustees of their father's trust (the Abdussattar Usnman Shaikh Living Trust, Dated March 3, 2014, hereafter referred to as the Trust). After the death of their father (Decedent), the brothers discovered Decedent executed a deed to transfer ownership of his Lemon Grove home (the Property) to the mosque he founded many years prior called the Center for Religious Tolerance, Inc., also known as the Center for Religious Tolerance-Masjid Usman (the Mosque). The Trustees believed the Mosque's chief executive officer (CEO), Tahir, bamboozled Decedent to donate the Property and his personal property to the Mosque. They assert Tahir, who is elderly, was guilty of financial elder abuse.

Presenting an entirely different take on the Property transfer are Defendants, who claimed they were unaware of the Trust and they did not know the deed transfer was invalid. They deny abusing Decedent, who devoted his life to the Mosque and helping the homeless. Early in the case, Defendants realized they could not afford to litigate and attempted to return the property to the Trustees in exchange for a refund of the money they had paid for the mortgage, insurance, and taxes. Tahir, dealing with language barriers and coping with serious health issues, erroneously believed turning

2

over the Property would end all legal proceedings.  In addition, Defendants failed to recognize that although the coronavirus disease 2019 (COVID-19) pandemic stopped some businesses from operating, the court closures were temporary and parties were expected to continue litigating cases.

In early 2021, due to multiple discovery sanctions, all that was left to be determined was the issue of damages.  The final judgment stated:  (1) Decedent's home was owned by the Trust, (2) Tahir was the alter ego of the Mosque and vice versa; and (3) Tahir and the Mosque were jointly and severally liable for triple damages ($198,000), attorney fees ($54,654) and costs ($3,514).

The Trustees filed an appeal asserting the trial court erred by failing to assess a mandatory civil penalty against Defendants, pursuant to Probate Code section 859.  Defendants filed an appeal challenging the court's imposition of multiple discovery sanctions despite the fact they participated in discovery to the best of their abilities.  We consolidated the appeals.  On our own motion, we augmented the record to include 42 documents and rulings filed in the court because *neither* party provided this court with an adequate record to fully understand what happened in this case.  We also invited the parties to file supplemental briefing to address several concerns we had that were not mentioned in the briefing.  We have considered all the briefing, and we grant the Trustees' motion to augment the record with one additional document.  With the benefit of having a complete record, we reverse the judgment, the preliminary injunction, and all the discovery orders.  The matter is remanded for discovery and pretrial law and motion proceedings.  We strike the first amended petition, and the Trustees can seek leave to amend the petition.  Defendants, with the benefit of effective counsel, may file opposition.

3

FACTS

Decedent established the Trust on March 3, 2014, revoked it, and then restated it unchanged on November 3, 2016. Decedent transferred the Property to the Trust in his capacity as trustee. He gave his sons, the Trustees, a future interest in the Property as tenants in common. He died in early March 2019 at age 83. The Trustees are Decedent's only living family members.

I. *The Original Complaint/Petition*

On April 5, 2019, the Trustees initially filed a civil lawsuit (Orange County Superior Court case No. 30-2019-01064782). The following month, Defendants, represented by counsel, Jonathan Preston, filed an answer.

In July 2019, the matter was transferred to the superior court's probate department and assigned a new case number (Orange County Superior Court case No. 30-2019-01082289). All original filings were deemed to have been filed on July 11, 2019.[1]

We took judicial notice of the original petition. It alleged that in 2003, Decedent was a founding member of the Mosque, and it was registered with the California Secretary of State as a non-profit corporation. Decedent funded the Mosque using real property located in Lemon Grove.

The petition further alleged that toward the end of his life, Decedent suffered from medical and psychiatric issues. In 2016, he was diagnosed with several different terminal illnesses and was frequently hospitalized.

The Trustees maintained that in 2014, Decedent asked one of his sons, an attorney, to prepare an estate plan, which included "a living trust." The Trustees claimed Decedent also asked for a grant deed, putting the Property into the Trust during

---

[1] The record shows that after the case was transferred, the court began calling the Trustees' complaint a petition and the answer an objection. However, an objection must be verified, and this answer was not. For this reason, we will refer to the document as an answer, despite the language adopted by the probate court and the Trustees.

4

Decedent's lifetime and "gifting the future interest in his home equally to his two sons." On November 3, 2016, the Trustees quitclaimed their interests in the Property to the Trust, which designated them as the trustees and beneficiaries. The Trustees asserted they took these steps to make sure the Property was not sold. That same day, the Trust was revoked and restated without "anything substantively new." The Trustees claim the Trust "was restated so that an independent notary could witness the signatures."

That same year, Tahir began "taking a dominant role in Decedent's life." The Trustees alleged Tahir became Decedent's emergency contact for healthcare providers and a caregiver. Tahir was involved in Decedent's business affairs. Decedent began referring to Tahir as his son.

In 2017, the Mosque's board changed and Tahir became the CEO and Decedent the chief financial officer (CFO). Decedent's longtime friend, Tajjammuddin Khan, was listed as the Mosque's secretary. The Trustees asserted Khan was unaware of his role in the Mosque until after Decedent's death.

That same year, it was alleged "a homeless transient," also referred to as "Nafa," started living with Decedent as his caregiver "under the direction and supervision of Tahir." The petition alleged Nafa stole money and other property from Decedent, who reported the matter to adult protective services.

The petition alleged that on February 2, 2018, Tahir directed Decedent to execute a grant deed, purportedly transferring the Property to the Mosque (the Grant Deed). The Trustees believed the Grant Deed had several defects. Most notable was that the Property was previously transferred to the Trust and Decedent signed the document in his personal capacity, not as trustee.

After the transfer, Decedent continued to live at the Property. Tahir continued to manage Decedent's financial affairs. The week after Decedent's death, Tahir told the Property's neighbors that he owned the home and its contents. The petition also alleged Tahir "took control of all of Decedent's bank accounts and credit cards,

5

spent [and] continued [to] spend Decedent's money through Decedent's last hospitalization and even after [his] death." In addition to causes of action for financial elder abuse and conversion, the petition alleged the Mosque "was a sham corporation that operated as the alter ego of . . . Tahir." It stated Tahir and the Mosque had unity of interest. Additionally, the petition alleged Tahir governed the Mosque without maintaining corporate formalities. The Trustees claimed Tahir made all the decisions and did not record board meetings or register the corporation as a charity with the California Department of Justice.

The Trustees' prayer for relief sought an order invalidating the Grant Deed and that the Mosque was the alter ego of Decedent and/or Tahir. They maintained any assets owned by the Mosque belonged to Decedent's estate. They sought monetary damages (according to proof at the time of trial), the return of personal property, double damages pursuant to Probate Code section 859, and punitive damages "as allowable by statute."

II. *Discovery and Settlement Negotiations*

A few months after filing the petition, the Trustees served separate discovery requests on Tahir and the Mosque. The Trustees propounded their first set of request for admissions (RFA), request for production of documents (RFP), form interrogatories (FROGS), and special interrogatories (SROGS) to Tahir. They sent the same four written discovery requests to the Mosque. In September 2019, when the Trustees did not receive complete responses, their counsel sent a meet and confer letter to Defendants' counsel, Jonathan Preston.

Soon thereafter, Defendants submitted responses to some but not all of the discovery requests. In November 2019, Preston asked the Trustees to temporarily suspend discovery to engage in an informal settlement conference. The parties reached a tentative settlement agreement and extended the discovery deadlines to January 6, 2020.

6

All did not proceed as planned. Tahir refused to sign the settlement agreement or come to Preston's office to comply with the remaining discovery issues. On December 8, 2019, Preston received a letter stating the Defendants did not have the ability to incur further legal expenses and disclaimed any further interest in the Property. They told Preston they could not continuing litigating and keep paying the mortgage and property taxes. They were willing to give the Trustees the Property.

III. *Motion to Compel and Request for Monetary Sanctions*

On January 15, 2020, the Trustees filed two motions to compel further discovery responses. The first motion alleged Tahir's responses to RFA Nos. 1, 3, 20, 21, and 29 to 37 were non-responsive. The second motion alleged Tahir's response to FROG No. 17.1(d) was inadequate because it asked Tahir to identify facts, witnesses, and documents for the denied RFAs (RFA Nos. 6-12, 14, 17, 18 and 24). The third motion, filed a week later on January 21, 2020, alleged the Mosque failed to respond to the RFP. This was the only motion to compel discovery filed against the Mosque. The Trustees requested monetary sanctions in all the motions.

IV. *Trustees Ask to Amend the Complaint*

The following month, the Trustees filed a motion for leave to file a first amended petition (FAP). Having obtained additional information during discovery, they asserted the new petition contained newly discovered facts and additional damages. The petition alleged the following new information: (1) the Grant Deed was defective because it transferred the Property to an entity having a similar sounding name as the Mosque, but it was not a corporation or business recognized by the California Secretary of State;[2] (2) Tahir acted in bad faith by taking possession of the Property and Decedent's personal property; (3) Decedent, under Tahir's care, was left impoverished and dependent

---

[2] Decedent signed the Grant Deed transferring his residence to the Center for Religious Tolerance-Masjid Usman. The organization was registered with the Secretary of State as simply the Center for Religious Tolerance, Inc.

on Tahir; (4) Defendants are liable for treble damages under Civil Code section 3345, attorney fees under Welfare and Institutions Code section 15657.5, subdivision (a), and for pain and suffering under Welfare and Institutions Code section 15657.5, subdivision (b); (5) Defendants' refusal to turn over the Property was in bad faith as defined by Probate Code section 859, and they must pay double damages and attorney fees; (6) the Trustees sought recission of the Grant Deed pursuant to Civil Code section 1689, subdivision (b)(1); and (7) "Tahir should be personally responsible for his actions, along with [the Mosque], jointly and severally, and the corporate form should be disregarded to prevent injustice."

V. *Defendants Sever the Attorney-Client Relationship*

In February 2020, Preston served the Trustees with oppositions to the three discovery motions.[3] In the opposition to the motion to compel further FROGS from Tahir, Preston maintained Tahir answered "most of the discovery" and the main issue in the case turned on the enforceability of the Grant Deed. He stated the motion sought a further response to only one interrogatory (No. 17.1) in correlation with several RFAs. Preston explained that because Defendants lacked funds and had disclaimed interest in the Property in early December 2019, they "erroneously believed that the litigation would somehow conclude." Preston stated he informed Defendants that unless he was paid for his representation he would have to withdraw as counsel. Tahir informed Preston he was seeking new counsel located closer to the Mosque.

With respect to the motion's merits, Preston indicated Tahir did not contest his duty to file an amended interrogatory response. However, Preston asked the court to continue the matter, set a new discovery deadline, and if it was not met, then grant the motion to compel and order sanctions against Defendants only. He argued sanctions against counsel were not warranted because he had repeatedly asked Tahir for additional

---

[3] Preston served the parties on February 20, 2020, but he did not file the oppositions until March 3, 2020.

8

information and to complete discovery. In the concluding paragraph, Preston stated he intended to file a motion to withdraw as counsel in time to be heard *at the same time* as the Trustees' motions to compel.

Preston's opposition to the motion to compel further responses to the RFAs from Tahir repeated information regarding Defendants' limited financial resources. Preston offered more information about why the settlement negotiations failed, stating the following: "Unfortunately, the settlement agreement remains unsigned, as a result of cultural issues, and a lack of understanding by [Tahir] of legal issues concerning a notary signature. [Tahir], in communication with counsel, must find an Urdu interpreter because his English is poor."

In the opposition, Preston did not contest Tahir's need to revise his responses to the RFAs. However, Preston again asked the trial court to postpone sanctioning Tahir and set a new deadline for compliance. He repeated the motion to withdraw as counsel would be filed shortly and could be considered during the hearing on the motion to compel.

Preston's opposition regarding the motion to compel the Mosque to comply with the RFPs repeated much of the information stated above. He explained the Trustees made a similar demand for production against Tahir, who responded by turning over numerous documents that should have also been included in the Mosque's response to this discovery request. Preston stated Tahir produced a death certificate, bank statements, checks and deposit receipts, utility bills concerning the Property, tax bills, auto policy statements, and Secretary of State filings for the Mosque. He concluded the Trustees received all the information the Mosque possessed. He stated the Mosque lacked funding to do more.

In this opposition, Preston stated he had recently been informed Defendants retained new counsel and he was being substituted out. Preston stated he was filing the

opposition as "current counsel with the understanding that a new attorney may actually be counsel of record *when the motion is heard*."  (Italics added.)

In the Mosque's opposition, Preston provided more details about the settlement conference.  He stated members of the Mosque believed Decedent intended to convey his residence to the Mosque so it could be sold and used to fund structural improvements, for the purpose of housing the homeless.  Preston stated all the documents the Mosque possessed to prove this theory had been turned over to the Trustees by Tahir.  He noted there were no new documents and "the only documents which are likely outstanding are additional financial documents, which could include bank statements."  Preston admitted that technically the Mosque should separately produce the same documents Tahir has already disclosed.  He asked the court to set a new discovery deadline and order sanctions only if his clients missed the new deadline.  In his concluding remarks, Preston reiterated that he expected new counsel would be substituted in shortly.

The Trustees filed nearly identical replies to the oppositions.  They argued Defendants' financial situation did not excuse non-compliance with the discovery requests.  They argued sanctions against Tahir and the Mosque were warranted.  They did not assert counsel should be sanctioned.

VI. *The Court's First Discovery Hearing*

On February 26, 2020, the trial court held a hearing on the discovery dispute.  Abbas Gokal appeared for the Trustees.  Preston appeared for Defendants.  The parties agreed to have Temporary Judge Aaron Heisler hear the matter.  The court continued the three motions to compel discovery to March 11, 2020.  Because Preston had only served the oppositions on the parties, the court ordered Preston to file the oppositions with the court before the next hearing.  The minute order noted the parties waived oral argument and the court took the motions under submission.  Additionally, the

10

court acknowledged the Trustees withdrew their request for monetary sanctions against Preston.

VII. *First Preliminary Injunction Attempt*

Before the next hearing, the Trustees filed an ex parte application on March 3, 2020, for a preliminary injunction instructing Defendants to surrender title to the Property. To support their application, the Trustees cited to Preston's statements (in the oppositions to the motions to compel) that Defendants lacked the financial resources to litigate the dispute and maintain the mortgage and taxes on the property. Judge Gerald G. Johnston denied the ex parte application. The court's minute order explained the Trustees were seeking the same relief requested in the underlying petition. "There is no indication of irreparable injury should the order not be granted ex parte. [The Trustees'] petition may have merit. However, it appears to the court a properly noticed motion seeking preliminary injunction should be filed and set for hearing." On March 10, 2020, the Trustees filed a motion for a preliminary injunction identical to the ex parte version.

VIII. *Motion to Compel Tahir's Deposition and Monetary Sanctions*

On March 6, 2020, before the trial court ruled on the Trustees' first set of motions to compel additional written discovery, the Trustees filed a motion to compel Tahir's deposition and sought $2,460 in sanctions. They claimed Tahir failed to appear for his February 24, 2020, deposition. They added that prior to the scheduled deposition, Tahir did not object to the deposition notice. They asserted, "Tahir's failure to participate in the discovery process [was] unacceptable, in bad faith, and should not be tolerated." The Trustees complained, "There is simply no justification for [Tahir's] failure to appear at the scheduled deposition."

IX. *Motion to Withdraw as Counsel*

Later that same day, Preston filed a motion to be relieved as counsel for Defendants. In his supporting declaration, Preston stated that as a result of failed settlement negotiations, the attorney-client relationship had "broken down." He declared

11

Tahir claimed Defendants retained new counsel. Preston filed the motion to withdraw because Tahir had not given him a substitution of counsel form. He noted his clients had not paid any outstanding invoices nor made arrangements to pay them. He stated, "*I can no longer effectively represent my clients* and I ask the court to allow me to withdraw as attorney of record." (Italics added.)

X. *The Court's First Discovery Order*

On March 11, 2020, the trial court (Temporary Judge Heisler) issued a minute order, ruling on the three motions to compel additional discovery responses (the March 11 order). There were no appearances. It did not comment on Preston's motion to withdraw or mention the requests for continuances. It did not explain why it would not set a new discovery deadline to give Defendants' new counsel an opportunity to respond. The court simply stated the first two motions were originally scheduled to be heard in February 2020, and after hearing oral argument, the court took the motions under submission and considered Defendants' oppositions.

The trial court granted all three motions. It concluded the evidence showed the Mosque had not responded to the discovery requests. It noted the opposition offered an inadequate excuse. "[T]hose oppositions are essentially limited to a plea that [the Mosque] has limited resources and has chosen not to expend them on this litigation." The court said that while it was sympathetic "to that position," the Mosque must litigate the dispute because it filed an opposition to the petition. "Until and unless [the Mosque] withdraws its objection to . . . the operative petition, [the Mosque] remains a party subject to discovery like that at issue in these motions. Its lack of resource[s] is not a valid reason to excuse compliance with the Civil Discovery Act [(Code Civ. Proc., § 2016.010 et seq.)]." (Boldface omitted.)

The trial court ordered *the Mosque* (not Tahir) to answer RFAs Nos. 1, 3, 20, 21, 29 to 34, 36, and 37. It ordered *the Mosque* to serve verified further responses to FROG No. 17.1 regarding RFA Nos. 6, 7, 9 to 12, 14, 17, 18, and 24 and to the RFP.

12

The court determined the Trustees incurred costs totaling $5,600 (14 hours attorney time) plus $180 in filing fees. The court ordered the Mosque to pay $5,780 within 180 days. It gave the Mosque 21 days to comply with this order compelling further discovery.

Unfortunately, this ruling contained numerous errors that were not corrected until over three months later. Most troubling was the failure to differentiate between Tahir's and the Mosque's alleged discovery deficiencies. The March 11 order erroneously compelled the Mosque to comply with discovery that was directed at Tahir and pay sanctions relating to Tahir's incomplete discovery responses.

XI. *Preston's Final Two Appearances in This Case*

On April 6, 2020, Preston filed an opposition to the Trustees' request for a preliminary injunction. He asserted, "On March []6, 2020, I filed a motion to be relieved as counsel . . ., which is set for April 22, 2020. In light of the current court closure, and my previous motion to be relieved as counsel of record, *I am unable to effectively respond* to the current motion for preliminary injunction and a current motion to compel [Tahir's] deposition . . . ." (Italics added.) Preston was referring to the Orange County Superior Court's closure due to the COVID-19 pandemic.

Preston requested a continuance of both hearings "to a date after I am relieved as counsel of record. I ask the court to give my client sufficient time, after I am relieved as counsel, to respond to the pending motions."

Preston explained that in February and March 2020, he expected to receive a substitution of attorney form, but when he did not receive one, he filed the motion to withdraw as counsel. He confirmed the attorney-client relationship had broken down, and his clients needed new counsel to handle all discovery issues and respond to the preliminary injunction request.

That same day, Preston filed a separate opposition to the motion to compel Tahir's deposition. He declared that on February 21, 2020, he notified the Trustees' counsel by e-mail that Tahir needed a continuance "due to [the] retention of new

13

counsel." Preston notified the Trustees that Tahir would not be attending the deposition. Preston repeated much of the information stated in his opposition to the preliminary injunction. He confirmed his motion to be relieved as counsel was scheduled for April 22, 2020.

## XII. *Preston's Motion Continued*

Preston's motion was not heard on April 22, 2020. On May 8, 2020, the trial court issued an order continuing Preston's motion to be relieved as counsel until July 15, 2020. The court's order did not provide any explanation for the continuance, but we assume this was due to COVID-19 pandemic court closures. However, this continuance meant Defendants would be essentially without effective counsel from February to July 2020 (six months). Yet as will be seen, the Trustees and the court continued pressing forward with the case.

## XIII. *Trustees Seek Additional Discovery Sanctions*

On May 14, 2020, the Trustees filed motions requesting evidentiary and monetary sanctions. Specifically, they filed motions seeking the following relief: (1) evidence sanctions prohibiting the Mosque from introducing the requested documents into evidence; (2) $3,060 in monetary sanctions against the Mosque; (3) contempt sanctions against the Mosque for willful disobedience of a court order; and (4) an order compelling production of responses and documents against the Mosque.

In the motion, the Trustees pointed out the March 11 order contained clerical mistakes. They recognized the trial court incorrectly ordered the Mosque to respond to discovery propounded to Tahir and ordered a larger amount of sanctions than requested against the Mosque. They noted Tahir was not sanctioned nor ordered to comply with the discovery propounded against him. The Trustees claimed they brought this mistake to the court's attention in a document filed on March 20, 2020. It is unclear why the court did not respond or correct its order sooner.

14

Despite these mistakes with the March 11 order, the Trustees filed a discovery sanction motion against Tahir. They requested (1) evidence sanctions to prevent Tahir from introducing designated matters in the FROGS into evidence, (2) for the court to deem the RFA as admitted by Tahir, (3) monetary sanctions ($3,060), (4) contempt sanctions, and (5) further responses to discovery.

In support of both motions, Trustees' counsel, Nicholas D. Porrazzo, filed a declaration in support of their assertion Defendants "willfully refused to comply" with discovery requests and Porrazzo's office had made good faith efforts to resolve the discovery issues outside of court. He explained that after the discovery deadline passed, his colleague, Gokal, sent a letter to the Mosque's former attorney Preston to say the Trustees intended to file further motions to compel and for sanctions.

Porrazzo declared that on April 15, 2020, Preston informed the Trustees that he had been substituted out of the matter and the new attorney of record was Khalil Ahmad. The following day, Ahmad sent a letter confirming he had "signed on as counsel [as of] yesterday" and he was waiting to receive the case file from Preston. He asked the Trustees to delay further motions to compel for a reasonable time because he needed to review the record and because of "the prevailing situation" with COVID-19. Ahmad added he would need "two weeks to respond in a meaningful way."

Porrazzo asserted he responded to this letter by asking Ahmad to meet and confer. Ahmad agreed he could meet the following week. On April 28, 2020, 13 days after Ahmad was officially hired, he informed Gokal by e-mail that he had not yet received the files. Porrazzo informed counsel he would grant an extension to provide discovery responses until May 4, 2020. There was no response by that date.

XIV. *Trial Court's Second Discovery Order and FAP Accepted*

On July 1, 2020, Temporary Judge Heisler held a hearing on the Trustees' motions for leave to file a FAP and for sanctions. He gave the Trustees leave to amend their petition because he concluded there was no evidence the amendment would unduly

15

prejudice the opposing parties. In reaching this decision, the trial court did not address Preston's repeated requests for a continuance until new counsel was substituted into the case. By this point, Preston had repeatedly and clearly informed the court he was unable to effectively represent his clients. Despite these circumstances, the court construed Preston's silence and inaction as evidence Defendants would not be prejudiced by new allegations of bad faith and elder abuse, or additional statutory penalties and damages.

As for the trial court's prior orders compelling discovery, the court recognized it had made some mistakes. Nevertheless, it granted the motion for discovery sanctions against the Mosque. It reasoned that on March 11, 2020, it ordered compliance with all discovery requests, including the RFPs. "The court's record reflects that [the Mosque's] counsel was promptly served with a copy of the [March 11] order." The record reflects the Trustees served Preston, not Ahmad, with the order.

The trial court stated there was sufficient evidence the Mosque "willfully failed to comply" with the March 11 order. "Tellingly, there is *no opposition to this motion or any explanation* for [the Mosque's] ongoing refusal to make any attempt to perform its obligations under the Civil Discovery Act . . . . Further discovery sanctions are therefore warranted." (Italics added.) The court did not seem to recall (1) it continued Preston's motion to withdraw until July 15, 2020, (2) the undisputed breakdown in the attorney client relationship, or (3) the Trustees' counsel's declaration acknowledging Defendant hired a new attorney, Ahmad. It is unclear from the record why these events were not considered reasonable explanations for a corporation's inability to comply with the court's order. Nevertheless, the court sanctioned the Mosque $1,860 and imposed an evidentiary sanction related to the RFP. The court refused to impose a contempt order, concluding the evidentiary and monetary sanctions were adequate remedies.

With respect to Tahir, the trial court recognized the prior order did not mention his name. "The court sincerely apologizes for those errors and any

16

inconvenience caused by" their mixup. Recognizing this mistake could have been the reason why Tahir did not comply with the court's order, the court gave Tahir 21 additional days to file the necessary discovery responses.

XV. *Trial Court's Third Discovery Order and Third Continuance of Preston's Motion*

On July 15, 2020, Temporary Judge Heisler held a remote hearing via video conference due to the COVID-19 pandemic. Preston and the Trustees' counsel attended the hearing. The trial court *again* continued Preston's motion to be relieved as counsel. The court explained Preston's motion was supported by a declaration, but it was not written on the appropriate judicial council form. It continued the motion to August 12, 2020.

At this same hearing, the trial court continued the hearing on the motion to compel Tahir's deposition. It stated, "There is no evidence of any objection having been served before the scheduled deposition, nor any valid reason having been given for Tahir's failure to object, comply, or request to reschedule the deposition." It is unclear why the court failed to acknowledge Preston's objections or continuance request.

The trial court continued the matter because the Trustees failed to support their motion to compel Tahir's deposition with a declaration stating they attempted to contact Tahir and ask about the nonappearance. The court continued this motion and the Trustees' motion for a preliminary injunction to August 12, 2020.

Finally, the trial court noted its tentative ruling was to deny the request for a preliminary injunction, however, it wanted supplemental briefing on the following issues: (1) Was there evidence showing an imminent threat of irreparable harm?; and (2) Was the Property currently occupied or vacant? It ordered Defendants to appear personally "or by counsel other than . . . Preston" for the August 12, 2020, hearing.

XVI. *Preston's Declaration*

On July 23, 2020, Preston resubmitted his declaration on the correct judicial form. Because over four months had passed since his first declaration, he

17

provided additional information about the situation.  Preston declared Defendants terminated him as their attorney in February 2020.  He claimed to have signed a substitution of attorney form, substituting in Ahmad.  Preston stated, "I have since been trying to get off this matter as attorney of record, but I have been unsuccessful in getting the new lawyer and [Defendants] to execute a correct substitution of attorney form.  I filed this motion on March 6, 2020, as a result of the problems.  I now believe that the [Defendants] may not wish to participate in this matter any further."

XVII.  *Supplemental Briefing Regarding Tahir's Deposition*

On July 28, 2020, the Trustees filed supplemental briefing.  With respect to the motion to compel Tahir's deposition, they provided copies of e-mails written by Gokal and Preston in February 2020.  Specifically, on Wednesday, February 19, 2020 (4:57 p.m.), Gokal e-mailed Preston to say the deposition was scheduled for Monday, February 24, 2020, and they secured an Urdu interpreter costing $1,000.  He warned that if they cancelled within two business days, they would incur a $1,000 cancellation fee.  At 5:01 p.m., the same day, Preston wrote an e-mail stating he had not received any communication from Tahir, but he would try to speak with him.  He did not believe Tahir would be attending.  At 5:05 p.m., Preston responded Tahir answered his phone call.  Preston said Tahir had a new attorney who wanted to "come up to speed and continue the deposition.  Can you postpone the deposition.  He stated his attorney will be calling me tomorrow."

On Thursday, February 20, 2020, Gokal told Preston that his clients (the Trustees) were only willing to take the deposition off calendar if they received an executed substitution of attorney no later than 5:00 p.m. on Friday.  "[M]y client is unwilling to accept the word of your client, that he has found new counsel."  Gokal warned they would take a certificate of nonappearance and file a motion to compel sanctions.

18

On Friday, February 21, 2020, at 2:57 p.m., Gokal stated he had not received a substitution of attorney form yet. "Can you please confirm that notwithstanding the proper deposition notice, that [Tahir] will not be appearing on Monday? I'd prefer not to incur unnecessary charges that will ultimately be included in the motion for sanctions."

Preston replied less than an hour later that Tahir claimed his new attorney was in New York on a business trip, but he would soon be contacting Preston. Tahir confirmed he would not be attending the deposition on the advice of his new counsel. Preston asked if the deposition could be "h[e]ld off a few days" because he had not yet received the substitution of attorney form. Preston confirmed Tahir would not be attending the deposition on Monday if counsel wanted to take a certificate of nonappearance.

Gokal replied to Preston that his office would proceed with the motion to compel Tahir's deposition and seek sanctions. He noted that it was his practice to be cooperative, but he had not even been provided the name of the new attorney representing Defendants. "If this unnamed attorney is actually accepting representation of [Defendants], . . . common practice is to call or e[-]mail opposing counsel and request a continuance. I would have been more than willing to accommodate a continuance." He concluded by stating Preston's client had a pattern of failing to comply with discovery requests.

XVIII. *Trial Court's Fourth Discovery Order*

On August 12, 2020, Temporary Judge Heisler ruled on five motions. First, the trial court ruled on the Trustees' evidentiary and sanctions motion against Tahir. It decided issue sanctions were appropriate with respect to the RFA, set one, Nos. 1, 3, 20, 21, 29 to 34, 36, and 37. It ruled, the facts set forth in those RFAs "shall be taken as established against Tahir." The court determined evidentiary sanctions were appropriate with respect to FROG, set one, No. 17.1 (regarding RFA Nos. 6, 7, 9-12, 14, 17, 18, and

19

24).  The court ruled, "Tahir is . . . precluded from offering any evidence in connection with litigation of [the Trustees' FAP] that would have been responsive to [FROG No. 17.1]."  In addition, the court imposed $1,860 in monetary sanctions against Tahir.  The court denied the request for a contempt order.

Second, the trial court granted the motion to compel Tahir's deposition.  The court noted there was *no opposition nor specific objections made* to the notice of deposition before the scheduled deposition or any *opposition* to the motion to compel.  The court awarded $1,160 in monetary sanctions.

Third, the trial court granted the Trustees' "*unopposed motion*" (italics added) for a preliminary injunction.  It determined the Trustees met their burden of proof and the balance of harms favored issuance of the injunction.  "[T]here is essentially no evidence Tahir [or the Mosque] or any other interested person will or is likely to suffer any appreciable harm" by the injunction.  The court stated the Trustees made a persuasive argument that there was "a strong likelihood that they will ultimately prevail on the claims presented in their [FAP] especially (but not only) because Tahir and [the Mosque's] conduct strongly suggests that they have abandoned their opposition to the [FAP]."  Finally, the court determined Defendants forfeited their right to an undertaking, which would otherwise be a condition to the issuance of a preliminary injunction.

The fourth and fifth orders related to Preston's motions to be relieved as Defendants' counsel.  The trial court granted the motions because Preston had filed his declaration on the correct form.  It stated the order relieving counsel would be effective on the filing date of Preston's proof of service of the notice of ruling and the signed orders relieving counsel.

As a final matter, the trial court set an order to show cause (OSC) for November 2, 2020, as to why Defendants' objections to the petition should not be

20

stricken.[4]  The Trustees' notice of ruling elaborated the court believed Defendants' objections to the petition should be struck "for failure to participate."  It appeared that the trial court was considering a terminating sanction.  (Code Civ. Proc., § 2023.030, subd. (d)(4) [striking the answer and entering a default is a sanction for misuse of the discovery process].)

XIX.  *Striking Defendants' Answer*

On November 2, 2020, Judge Hubbard held a remote hearing due to the COVID-19 pandemic.  Only the Trustees' attorney, Gokal, attended the hearing.  The trial court continued the OSC to November 23, 2020.  Judge Hubbard's minute order stated, "Failure to file verification to objections and substitution of attorney shall result in the court ordering the objections stricken."

On November 23, 2020, Judge Hubbard held a remote hearing attended by Gokal and *Preston* (although he had been relieved of counsel in August).  The trial court's minute order stated the Defendants' objections filed July 11, 2019, were stricken.  It scheduled an evidentiary hearing on the Trustees' petition for financial elder abuse for January 6, 2021.  The court invited the parties to file briefs before the hearing.

XX.  *Substitution of Attorney and Trial Briefs*

Defendants filed a substitution of attorney form on December 7, 2020.  Tahir and Preston signed the document on December 3rd and Ahmad signed it on December 4th.

On December 29, 2020, Gokal filed a brief stating that since the inception of the case, Defendants had "consistently and completely failed to participate in any way whatsoever, which has necessitated . . . filing of many motions to compel written

---

[4]  Based on our review of the record, it does not appear that Defendants filed any objections in this case.  Preston filed an answer to the original complaint in May 2019, before it was transferred to the probate department of the superior court in July 2019.

21

discovery, motions to compel deposition, and motions for additional sanctions. [Defendants] have utterly failed in their obligation to defend this case." In their summary of facts, the Trustees did not mention that for the past seven months Defendants had been without effective legal representation. Nor did they discuss why the evidence Defendants produced was inadequate. They did not mention Preston filed objections and requests for continuances, or that the Trustees knew Defendants hired a new attorney in March 2020.

The next day, Ahmad filed a brief trying to undue all the damage caused by the discovery sanctions imposed during his absence. Ahmad apologized that his brief was "hastily put together" because he did not have notice regarding the evidentiary hearing and believed the upcoming hearing date was for a status conference. He attached the Trustee's December 7, 2019, "notice of hearing" that expressly stated a "status conference" was scheduled for January 6, 2021. (Capitalization omitted.) The notice did not mention the upcoming evidentiary hearing on damages.

Ahmad stated, "Due to the [COVID]-19 situation, a lockdown and . . . [Tahir's] pre-existing health conditions including a serious heart condition, he was not able to get the needed documents and his further responses based on them to his new counsel . . . Ahmad." He explained Defendants changed counsel in March 2020. The substitution of attorney form was initially rejected, and the second attempt took place when the Governor of California ordered a lockdown due to the COVID-19 pandemic. Ahmad stated Tahir's doctor told him to stay home and not expose himself to COVID-19, and Tahir lost contact with his attorney and was unable to provide additional discovery responses. Similarly, Tahir could not appear at a deposition due to his doctor's orders. Ahmad stated that in any event, the Trustees never proposed a date to reschedule the deposition.

Ahmad stated Defendants attempted to resolve the case "but no progress was made due to shifting demands of the [Trustees]." Ahmad stated Defendants had continued to pay the mortgage and taxes on the Property. In addition, they had offered to

return the Property and simply be reimbursed for "expenses incurred." Ahmad stated the Trustees initially agreed to reimburse Defendants but then later declined to do so.

In Defendants' brief, Ahmad offered additional background facts about Decedent's relationship with the Mosque. Ahmad stated that when Decedent transferred the Property to the Trust in 2014, he was also "actively participating" in meetings and events at the Mosque. He was the Mosque's founding president, who later became the CFO and secretary. Decedent received $900 per month from the Mosque, which was money raised through contributions of the Mosque's members and officers.

Ahmad explained Decedent survived on social security benefits and disability payments. At some point, Decedent's nephew, Zahid Bhati, cosigned a mortgage loan with Decedent and they used a joint account to make the payments. Defendants deposited $900 into the joint account to make the mortgage payment. Ahmad stated Bhati could testify about this arrangement and also shed light on Decedent's "tense relations" with his sons (the Trustees).

In the brief, Ahmad stated Decedent allowed Nafa to become his caregiver and roommate. Ahmad stated Tahir did not arrange for Nafa to work for Decedent. In addition, he refuted claims the Mosque did not observe corporate formalities. Ahmad asserted the Mosque held regular meetings and filed required documents with the Secretary of State. Defendants also disagreed with claims that Decedent lacked the mental capacity to make decisions. Decedent intended to gift the Property to the Mosque so that it could use the sale proceeds to build a second story on the Mosque's building to house the homeless. The brief alleged that two weeks before his death, Decedent asked an engineer to come to the house to discuss the second story construction. Ahmad asserted the engineer could testify about Decedent's mental capacity.

Ahmad maintained that after Decedent's death, his son Arif took Decedent's personal belongings. Nafa had the key to the Property and turned it over to Tahir. A group of the Mosque's members video recorded themselves entering the

23

Property and observed it had been ransacked. Thereafter, Defendants continued to pay the mortgage, property taxes, and utility bills on the Property. They did not use the premises for any purpose and have repeatedly offered to transfer the Property to the Trust. Defendants asked the Trustees to pay them back the money they spent on the Property. Later, when Tahir's health declined, he "agreed to walk away from" the Property, but the Trustees would not agree and pursued discovery sanctions.

Turning to the merits, Ahmad argued Defendants had been sanctioned for noncompliance with discovery orders "despite the fact that they had submitted whatever was at that time in their knowledge or possession." He stated Tahir's poor health, the COVID-19 pandemic, and his difficulties effectively communicating with counsel were reasons for the lack of discovery compliance. Defendants "regret and apologize to the court [for] this lack of participation and non-compliance." He added that there was no evidence of economic damages because neither Tahir nor the Mosque took any of Decedent's personal property.

Ahmad supported the brief with his declaration. He stated that due to the COVID-19 pandemic, he was never directly in contact with Tahir and he did not have Tahir's contact information. He declared Tahir used a third party to communicate information and this person would not provide Tahir's phone number. He attached several exhibits showing the Mosque observed corporate formalities. Ahmad concluded Defendants submitted their responses to the written discovery propounded to the best of their knowledge and belief.

XXI. *Damages Prove-up Hearing*

At a hearing on January 6, 2021, the trial court (Judge Hubbard) noted "that objections by Defendants were stricken per" the November 23, 2020, minute order. The court also noted the RFAs as to Tahir were admitted on August 12, 2020. The court continued the "[s]tatus [c]onference" and requested "further declaration[s] regarding the reasonableness of attorney fees, sanctions, and other figures being requested."

24

The Trustees filed a supplemental brief stating the hearing set for January 20, 2021, was a continuation of the evidentiary hearing held on January 6, 2021, and they wanted to respond to the trial court's statement it was "disinclined to award" treble, double, or punitive damages. They acknowledged the court only requested briefing on the issues of unpaid sanctions and the calculation of prejudgment interests and attorney fees. Nevertheless, the Trustees asserted treble or double damages should be based on the estimated market value of the Property, which was $495,000. The Trustees clarified they were not seeking return of title to the Property and economic damages. The fair market value was only being used to calculate treble, double, or punitive damages.

The Trustees added Defendants owed over $10,000 in discovery sanctions. Their attorney submitted a declaration to support the request for attorney fees. The Trustees estimated the loss of personal property was between $5,000 and $10,000, but the exact sum could not be determined due to Tahir's unwillingness to participate in discovery. They discussed how the evidence supported an alter ego finding between Tahir and the Mosque.

The Trustees asked the trial court to order return of the Property and for Defendants to pay $1,485,000 treble damages or $990,000 double damages. Alternatively, they asked for treble damages of $198,000 or double damages of $132,000 (based on lost rental value). They asserted attorney fees totaled $54,654, and litigation costs were $3,514. They urged the court to find Tahir was the alter ego of the Mosque and vice versa, meaning both parties were jointly and severally liable for the damages awarded.

Defendants filed supplemental briefing reminding the trial court that at the prior hearing it determined treble, double, or punitive damages would not be awarded. They recalled the court declined to award interest on discovery sanctions. They did not understand why the Trustees' brief revisited those issues and disregarded the court's ruling that the supplemental briefing address the issue of attorney fees.

25

Defendants argued that most of the attorney fees in this case were unnecessary because from the beginning Defendants offered to reach a settlement and avoid litigation expenses. They added the invoices spanned 45 pages, were unnumbered, lacked dates, and appeared to be excessive. They stated one invoice showed a 24-minute phone call between the parties' counsel, but Ahmad attested all calls lasted no more than five minutes. Ahmad believed there were errors in timekeeping. The trial court took the matter under submission.

XXII. *Statement of Decision*

On January 27, 2021, the trial court issued a minute order summarizing the procedural background of the case. Judge Hubbard noted the Trustees filed a civil complaint in 2019 that was stricken and deemed filed as a probate petition on July 11, 2019. They also filed a FAP on the same causes of action. "[Defendants] filed objections thereto."[5]

Judge Hubbard reported the discovery dispute as follows:[6] "Discovery commenced and stopped. Respondents did not respond appropriately to ANY requests for admissions, interrogatories or even appearing for deposition. In their brief to the [c]ourt regarding damages, Respondent, Syed Tahir, asserted that he did not really understand what was going on and just wanted to settle the matter without court proceedings and if [the Trustees] would have only worked with him to resolve the matter

---

[5] As stated previously, the record shows Defendants filed an unverified answer to a complaint, not objections to the FAP. When the case was moved to the probate department, the answer and other documents were transferred and all stamped July 11, 2019.

[6] We have intentionally not made any grammatical edits or other changes to the trial court's ruling. As will be discussed later, it can be inferred from the court's choice of words that it considered Tahir's and the Mosque's discovery responses, or more accurately stated, the perceived lack of "any" response, to be misconduct by just one entity: It viewed Tahir and the Mosque as one and the same.

26

none of the attorney[] fees and costs would have been necessary. [¶] Perhaps that is all accurate, however, it is irrelevant. Wanting to settle a matter is no excuse for completely failing to respond to court process. In fact, the failings here were so great that Respondent's objections were stricken, requests for admissions were deemed admitted and they were precluded from giving any evidence on matters to which he did not respond to interrogatories. Monetary sanctions were also imposed, which have never been paid. Further, Respondent filed no objections to the motions to compel.

"Due to the evidentiary sanctions imposed, the resulting trial was really a prove up for damages and attorney[] fees. Both parties were allowed to file further briefs in regard to the requests for damages and for attorney[] fees and costs. Respondents have asserted this [c]ourt advised [the Trustees] that it would not award double or triple damages as there was no real damage. The [c]ourt actually stated it was not inclined to award such damages but would consider [the Trustee's] brief. The [c]ourt has now considered both briefs filed and rules as follows:"

(1) The Property is owned by the Trust.

(2) Defendants owe "[t]riple damages of $198,000 based on the pro rata value of the [P]roperty for the time [the Trustees] were wrongfully denied possession . . . ."[7]

(3) Defendants must pay $54,654 in attorney fees and $3,514 in costs to the Trustees.

(4) The court vacated all other previously awarded discovery sanctions.

(5) Tahir was the alter ego of the Mosque, and vice versa, and both are jointly and severally liable for the damages awarded.

---

[7] Triple damages of $198,000 were based on the pro rata *rental* value of the property for the 22 months the Trustees were denied possession. (The rental fair market value of $3,000/month multiplied by 22 equals $66,000. This sum multiplied by three equals $198,000.)

On March 15, 2021, the trial court issued a statement of decision reiterating trial was "essentially a prove[-]up hearing for damages and attorney fees." The statement of decision repeated the findings made in the January 27, 2021, minute order. Two statements were clarified. The court repeated, "[Tahir] and [the Mosque] (collectively Respondents) did not respond appropriately to ANY requests for admissions or interrogatories, and even failed to appear for deposition." The court also ruled, "The failings here were so great that Respondents' objections were stricken, requests for admissions were deemed admitted, and Respondents were precluded from giving any evidence on matters to which they did not respond to interrogatories. [¶] . . . [¶] . . . Respondents filed no objections to the motions to compel."[8]

## DISCUSSION

We begin with Defendants' appeal challenging the various discovery sanction orders. Our review calls for more than a piecemeal examination of each court order. It is important to examine the totality of the circumstances, giving needed context for *when* these sanctions were imposed.

It is undisputed Defendants' relationship with their attorney Preston started to break down around the same time settlement negotiations failed in December 2019. Due to various factors, there was an extraordinary delay in processing Preston's motion to withdraw as counsel and substituting Defendants' new counsel of record into the case. The trial court's inaction put Defendants' legal representation in limbo for approximately

---

[8] We appreciate Judge Hubbard did not preside over the discovery dispute, but this statement includes several factual inaccuracies. Defendants' answer, not objections, was stricken. Defendants responded to some discovery requests. The Mosque's failure to produce documents resulted in one evidentiary sanction against it. Tahir responded to the RFP and was not precluded from introducing documents. Tahir's RFA were deemed admitted, not the Mosque's RFA. Tahir, not the Mosque, was precluded from giving the evidence that Tahir did not respond to FROGS. And finally, Preston filed oppositions on Defendants' behalf to the discovery motions.

28

five months,[9] but at the same time the court pressed forward with the case (at the Trustees' urging).  Rather than consider Preston's many continuance requests, the court expected compliance with its discovery orders and imposed incrementally severe discovery sanctions, until nothing was left of the case.

I. *COVID-19 Emergency Orders and Trial Court Proceedings*[10]

We appreciate the court faced significant calendaring difficulties during the COVID-19 pandemic.  On March 16, 2020, Chief Justice Tani Cantil-Sakauye, acting in her capacity as Chairperson of the Judicial Council of California (Judicial Council), issued her first order authorizing the Orange County Superior Court to declare March 17, 2020, to March 27, 2020, holidays.[11]  Thereafter, subsequent orders extended the court closures.  The courts handled only time sensitive matters until May 22, 2020.  On June 9, 2020, the Orange County Superior Court issued an administrative order stating that for the next 90 days, due to the backlog in criminal cases, the civil and probate jury trials

---

[9]     Preston filed his motion to withdraw on March 6, 2020.  After several continuances, the motion was granted August 12, 2020 (over five months).  On December 7, 2020 (117 days later), the court accepted Defendants' substitution of attorney form.  Thus, the issue of legal representation was in limbo for nine months.

[10]     "On the court's own motion and for good cause, we take judicial notice of the various official acts referenced in this decision.  [Citation.]" (*People v. Breceda* (2022) 76 Cal.App.5th 71, 76, fn. 4.)

[11]     (Chief Justice of California Emergency Order for the Superior Court of Orange County <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Orange%25203. 16.20.pdf> [as of Sept. 26, 2023], archived at:  <https://perma.cc/VTA3-4N5V>.)

29

would not be scheduled for trial unless there was good cause.[12] This order postponed many civil matters until the winter of 2020.

Thus, civil trial courts were understandably faced with significant scheduling issues. We appreciate there were also unpredictable delays created when staff, counsel, or the parties became sick or needed to care for others. Thus, the trial court's failure to rule on Preston's March 2020 motion to withdraw as counsel for five months is understandable. From March 2020 to the end of 2020, there were numerous acceptable reasons and logistical reasons out of the court's control, justifying continuances and delays in ruling on Preston's motion.

What we find difficult to understand is why the trial court postponed the question of legal representation but continued adjudicating multiple discovery disputes in the summer of 2020 and ultimately struck Defendants' answer (knowing Defendants lacked effective representation). During the best of times, it would be impressive for a court to hold six thorny hearings in less than six months, effectively disposing of the entire case. Here, the court, in addition to issuing discovery sanctions, determined the Trustees could amend their complaint and also regain possession of the Property that was the original reason for filing the complaint. We find the court's expediency in adjudicating this case in nine months (amidst COVID-19 lockdown orders) disconcerting.

II. *Need for a Continuance*

Preston filed five oppositions on Defendants' behalf in this case. Each one contained a request for a continuance on behalf of Defendants because they were transitioning to a different attorney. Preston informed the trial court (and opposing counsel) he could not effectively represent Defendants' interests due to a breakdown in

---

[12] (Temporary Procedure to Establish Good Cause to Conduct Civil and Probate Jury Trials <https://www.occourts.org/system/files/general/administrative_order_20_18_temporary_procedure_to_establish_good_cause_to_conduct_civil_and_probate.pdf> [as of Sept. 26, 2023], archived at: <https://perma.cc/M78Y-LR46>.)

30

the attorney-client relationship, language barriers, and cultural differences. We have searched the record, and it appears the court did not mention or directly rule on any of these continuance requests. Moreover, we found nothing in the record suggesting opposing counsel directly addressed or opposed the continuance requests. It is unclear if the requests were overlooked, ignored, or impliedly denied. Whatever the case may be, we conclude it was error not to have granted a continuance on discovery-related disputes (for a least as long as the court continued ruling on Preston's motion to be relieved as counsel).

"A motion for continuance is addressed to the sound discretion of the trial court. [Citation.] However, '"[t]he trial judge must exercise his [or her] discretion with due regard to all interests involved, and the refusal of a continuance which has the practical effect of denying the applicant a fair hearing is reversible error. [Citations.]"' [Citation.] [¶] 'Judges are faced with opposing responsibilities when continuances . . . are sought. On the one hand, they are mandated by the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.) to actively assume and maintain control over the pace of litigation. On the other hand, they must abide by the guiding principle of deciding cases on their merits rather than on procedural deficiencies. [Citation.] Such decisions must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency. [Citation.]' [Citation.]" (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395 (*Oliveros*).)

*Oliveros* was a medical malpractice case in which the trial court denied an unopposed request for a continuance where the request was made because, unexpectedly and through no fault of his own, the attorney for the county was engaged in another trial. (*Oliveros, supra,* 120 Cal.App.4th at pp. 1393-1394.) The trial court had granted two continuances previously. (*Id.* at p. 1392.) The first related to the parties need to

31

complete discovery.  The second accommodated the county's attorney scheduling conflict.  In denying the request for a third continuance, the lower court made comments about court congestion and judicial timeliness guidelines.  (*Id.* at pp. 1395-1396.)  The case went to trial on schedule, without either the county or its attorney present.  The county appealed.  (*Id.* at p. 1394.)

In concluding the trial court abused its discretion, the court in *Oliveros* explained, "'[E]fficiency is not an end in itself.  Delay reduction and calendar management are required for a purpose:  to promote the just resolution of cases on their merits.'"  (*Oliveros, supra,* 120 Cal.App.4th at p. 1396.)  The *Oliveros* court referred to *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242 (*Hernandez*) and *Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, both concerning requests for continuances so that the party could be represented by physically able counsel.  It noted those cases were similar to the situation before it in that the trial court's refusal to grant a continuance had the same effect:  "[a]n utter lack of legal representation in court." (*Oliveros, supra*, 120 Cal.App.4th at p. 1398.)

In *Hernandez, supra,* 115 Cal.App.4th at pages 1246 to 1247, the court similarly concluded the court abused its discretion by failing to balance the polices of controlling its courtroom versus a good cause for a continuance.  In that case, plaintiff's lawyer died three months before the trial was to begin and a month after his supplemental expert witness list was due.  (*Id.* at pp. 1244-1245.)  Plaintiff sought to continue the trial date and extend discovery to retain new counsel and designate an expert on liability issues.  (*Id.* at p. 1245.)  The trial court granted a 27-day continuance but did not extend discovery.  (*Ibid.*)  The appellate court agreed with plaintiff's assertion the court abused its discretion because the continuance granted was too brief to accommodate the prospective new attorney's trial schedule, and the refusal to reopen discovery failed to take into account the impact of prior lawyer's terminal illness.  (*Id.* at pp. 1245-1246.)

32

The court stated: "'"'"'To exercise the power of judicial discretion all the material facts in evidence must be known and considered, together also with the legal principles essential to an informed, intelligent and just decisions.' [Fn. omitted.]" [Citations.] . . . [¶] . . . Here, the trial court's orders promote judicial efficiency by maintaining strict time deadlines. [¶] But efficiency is not an end in itself. Delay reduction and calendar management are required for a purpose: to promote the just resolution of cases on their merits. [Citations.] Accordingly, decisions about whether to grant a continuance or extend discovery 'must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency.' [Citation.] What is required is *balance*. 'While it is true that a trial judge must have control of the courtroom and its calendar and must have discretion to deny a request for a continuance when there is no good cause for granting one, it is equally true that, absent [a lack of diligence or other abusive] circumstances which are not present in this case, a request for a continuance supported by a showing of good cause usually ought to be granted.' [Citation.]" (*Hernandez, supra,* 115 Cal.App.4th at pp. 1246-1247, italics added.)

As was the case in *Hernandez*, we conclude that balance was missing here. The trial court held Defendants to discovery deadlines without any allowance for the fact Defendants were transitioning to a new attorney. Preston candidly attested he could no longer effectively represent Defendants and they required a continuance to secure an Urdu-speaking attorney to litigate the pending discovery dispute. He declared Tahir did not understand his legal obligations regarding discovery due to language barriers and cultural misunderstandings. It is difficult to fault an elderly, Urdu-speaking litigant for failing to act while waiting for effective legal representation. Discovery is a crucial stage of litigation, and a continuance would have afforded these non-English speaking parties time to secure much needed legal assistance to defend themselves.

33

III. *Defendants Were Not Self-represented Litigants from March to August 2020*

The Trustees' motions, as well as the trial court's orders imposing all levels of sanctions, cited repeatedly to Defendants' bad faith conduct in failing to participate in "ANY" discovery. Sanctions were premised on the theory Defendants purposefully ignored court orders. Citing to the lack of objections, the court and counsel proceeded as if Defendants had abandoned the case. If Defendants were in fact dilatory self-represented litigants, this would be a very short opinion. But such is not the case.

What this court finds troubling is that the trial court (and the Trustees) knew all along Defendants were not self-represented litigants. First, it is common knowledge a corporation (the Mosque) cannot represent itself. "[U]nder a long-standing common law rule of procedure, a corporation, unlike a natural person, cannot represent itself before courts of record in propria persona, nor can it represent itself through a corporate officer, director or other employee who is not an attorney. It must be represented by licensed counsel in proceedings before courts of record. [Citation.]" (*CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1145.)

Second, the record contains numerous documents detailing exactly when the attorney-client relationship deteriorated between Preston and Defendants. In each opposition, Preston repeated his honest assessment he was no longer able to effectively represent his non-English speaking clients. He always requested the trial court postpone matters because he could not fairly address the merits of the various motions, and Defendants' new counsel was in the best position to speak on behalf of the corporation and Tahir. Defendants' new counsel, Ahmad, retained sometime in March 2020, claimed he was not permitted to make an appearance in the action for his clients until December 2020. Ahmad claimed the court rejected his efforts to file two substitution of attorney forms.

By delaying the issue of legal representation, the trial court created an untenable catch-22 situation for these Defendants. They could not make an appearance

34

or comply with court orders as self-represented litigants while Preston was still technically the designated attorney of record. Ahmad had no authority to make a court appearance until the court accepted the substitution of attorney.

It is well settled, "A litigant may appear in his own person or by attorney but cannot do both. A duly employed attorney of record has exclusive charge of the proceedings on behalf of his client. [Citation.]" (*Daley v. County of Butte* (1964) 227 Cal.App.2d 380, 391; 1 Witkin, Cal. Procedure (6th ed. 2022) Attorneys, § 258.) Because Preston was the officially designated attorney of record, he retained the exclusive right to appear in court for Defendants and "'neither the part[ies themselves] [citations], nor another attorney [citations], [could] be recognized by the court in the conduct or disposition of the case. [Citation.]' [Citations.]" (*People v. Merkouris* (1956) 46 Cal.2d 540, 554-555, italics omitted.)

In conclusion, it was improper for the trial court and opposing counsel to expect these parties to appear in court and raise objections as self-represented litigants at the same time Preston was filing motions asking for continuances. By pressing forward with the case, the trial court essentially deprived Defendants of the right to defend themselves. "There is a constitutional basis for the right to counsel in noncriminal proceedings and, in its narrowest definition, it is the right to appear by counsel in any adversary proceedings in which the adversary party has the benefit of the right to counsel. [Citation.]" (*Vann v. Shilleh* (1975) 54 Cal.App.3d 192, 200 (*Vann*).)

Based on the above, we reverse the judgment and vacate all the discovery orders. The Defendants, with the benefit of effective counsel, must be given the opportunity to participate in discovery, be heard on the motion to amend the complaint, and be afforded a fair opportunity for a trial on the merits.

IV. *Sanctions Against the Mosque*

Before concluding, we wish to briefly address one of the issues we asked the parties to include in their supplemental briefing. With respect to the Mosque, the

record shows there was only one motion to compel documents related to RFPs. Preston's opposition included the objection that many of the requested documents had been produced by Tahir (who was the Mosque's CEO). We asked the parties to brief whether the terminating sanction was appropriate because the Trustees did not move to compel the production of additional documents from Tahir. In other words, it appeared that the Mosque's alleged discovery misconduct was limited to one discovery request *and* related to documents already produced by Tahir.

The Trustees maintain the RFPs propounded against Tahir and the Mosque were different. They asked us to augment the record with a copy of the RFP served on Tahir to compare it with the one served on the Mosque. In hindsight, this tactic was perhaps a mistake. The RFPs overlap significantly. Moreover, on closer examination, the record suggests Tahir produced documents that were specifically requested in the RFP *served on the Mosque* but not included in the RFP served on Tahir personally (e.g., Secretary of State filing for the Mosque). Yet in their motion to compel, the Trustees asserted they did not receive "ANY" documents requested in the Mosque's RFP. The court, perhaps having a busy calendar or dealing with COVID-19 restrictions, did not take the time to ask the Trustees why the documents produced by Tahir were inadequate or how they were prejudiced. The court relied on the Trustees' representation that both Tahir and the Mosque were willfully and completely ignoring discovery rules and abandoned the case.

While the code provisions give the trial court wide discretion to impose evidentiary sanctions when a party has failed to respond to discovery requests, it should not be forgotten that the purpose of discovery is to share information which will lead to a fair decision on the merits. "A court has discretion to accept papers which are not in the form prescribed by the rules. [Citation.]" (*Morgan v. Ransom* (1979) 95 Cal.App.3d 664, 669.) Here, the Mosque's CEO, Tahir, tendered documents relating to both defendants and the Trustees have never complained they were prejudiced by receiving the

36

documents in this way. To the contrary, the Trustees referred to information they learned during discovery as the basis for seeking leave to amend their petition. If the court had continued the motion to compel discovery along with the motion to withdraw as counsel, the Mosque's new counsel could have resubmitted the documents in the correct format and objected to or disclosed whatever was missing.

Another issue we asked the parties to include in their supplemental briefing related to the justification for terminating sanctions in this case. There is some confusion about what exactly transpired at the end of the case before the damages prove-up hearing. With respect to the Mosque, there were only two motions leading up to the terminating sanction. As discussed above, the Trustees' filed a motion to compel the production of documents (many of which were supplied by Tahir). The Mosque, without the benefit of effective counsel, failed to produce the documents and the Trustees requested and secured issue sanctions related to the RFP. In August 2020, Temporary Judge Heisler determined that because it looked like the Mosque had abandoned the case, there would be no harm in transferring the property to the Trustees immediately and granted a preliminary injunction.[13] He also set an OSC regarding striking the Mosque's answer due to its "failure to participate." Thus, the trial court, on its own motion, set an OSC to impose terminating sanctions. "If a party fails to obey an order compelling . . . a response to a demand for production of documents, the court may impose a terminating sanction by striking out the pleading of that party and/or rendering a judgment by default against that party. [Citations.]" (*Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1516.)

---

[13] We note that in April 2020, Preston opposed the request for a preliminary injunction. If the Mosque had the benefit of effective representation, the trial court would have learned the Mosque was paying the mortgage and taxes on the Property. The need for a preliminary injunction was questionable.

Judge Hubbard's minute order confirmed the answer was stricken as a result of a terminating sanction, stating, "Discovery commenced and stopped. Respondents did not respond appropriately to ANY [discovery requests]. . . . [¶] Wanting to settle a matter is no excuse for completely failing to respond to court process. In fact, the failings here were so great that Respondent's objections were stricken."

In their supplemental briefing, the Trustees assert there were no terminating sanctions in this case. They direct our attention to the November 2020 minute order in which Judge Hubbard rescheduled the OSC set by Temporary Judge Heisler. The order warned the trial court would strike the Mosque's objections (its answer to the original complaint) if the Mosque failed to file verified objections or a substitution of attorney before the next hearing date. However, when this order is viewed in context, it is clear the court was giving additional reasons for striking the answer. The demand for verification and a substitution of attorney were tasks imposed in addition to participation in the discovery process.[14] As mentioned above, the court later acknowledged it struck the answer as a terminating sanction. The court's January 27, 2021, minute order stated, "[T]he failings here were so great that Respondent's objections were stricken, requests for admissions were deemed admitted, and they were precluded from giving any evidence." And "[d]ue to the evidentiary sanctions imposed, the resulting trial was really a prove up for damages and attorney[] fees." The reasons for striking the answer were repeated in the March 15, 2021, statement of decision.

This result was also mentioned in the Trustees' trial brief. They argued that the evidentiary hearing should be limited to the determination of the amount of damages.

---

14    We note this matter was originally a civil action, and the Mosque was not required to file a verified answer. The Mosque never filed a verified or unverified objection after the case was transferred to the probate department. Because we are reversing the judgment, we need not sort out whether the answer needed to be verified after the case was transferred. On remand, Defendants will need to file verified objections.

"[B]ecause of their failure to participate, [Defendants] have had their responsive pleading stricken, have been compelled—and failed—to provide court-ordered discovery, and have been the recipient of extensive monetary and evidentiary sanctions from the [c]ourt."

Certainly, when a party has repeatedly willfully failed to provide evidence to the opposing party as required by the discovery rules, "preclusion of that evidence may be appropriate, even if such a sanction proves determinative in terminating the plaintiff's case. [Citation.] But '"[t]he *ratio decidendi* behind such cases[]" . . . is "that a persistent refusal to comply with an order for the production of evidence is tantamount to an admission that the disobedient party really *has no meritorious claim . . . .*" [Citation.]' [Citations.]" (*Biles v. Exxon Mobil Corp.* (2004) 124 Cal.App.4th 1315, 1327, italics added.)

Here, the Mosque's failure to produce further documents was more likely explained by the lack of effective representation than willful disobedience. The Mosque's elderly Urdu-speaking CEO did not understand the trial court's rules and procedures, and *efficiently* submitted one set of documents for himself and the Mosque. Many of the court's orders (including the final sanction order striking the answer) were based on the expectation Tahir was to file discovery or take action on behalf of the Mosque and vice versa *before* the court addressed the alter ego issue. We doubt this would have been an issue if the court had continued the case and resolved the crucial questions surrounding representation *at the same time* it considered discovery sanctions. The court's perception about the Mosque's (a corporation) willful lack of participation was mistaken. It is as if the court forgot the Mosque lacked effective legal representation.

And on a final note, after closer examination of the record, we suspect Tahir's multiple discovery failures were perhaps inappropriately attributed to the Mosque. Because the alter ego determination had yet to be decided in the case, the trial

39

court lacked legal grounds to attribute Tahir's "bad faith" conduct to the Mosque. We are not simply referring to the ill-conceived March 11 order that completely failed to differentiate between Tahir and the Mosque and ordered the Mosque to answer discovery propounded on Tahir and pay sanctions requested from Tahir.[15] Although the court eventually corrected this error, the court's subsequent orders suggest it continued to view Tahir and the Mosque as one and the same. For example, Judge Hubbard's January 27, 2021, minute order often referred to Tahir and the Mosque collectively as one "respondent" or mentioned only Tahir by name. The court wrote, "[T]he failings were so great that Respondent's objections were stricken," and "Respondent filed no objections to the motions to compel."

If the trial court had taken the totality of the circumstances into account, including the need for a continuance to substitute in new counsel, there would be insufficient evidence the Mosque had a history of willful discovery abuse and an unexcused lack of participation. We recognize that our standard of review is deferential. But "[t]he law favors judgments based on the merits, not procedural missteps." (*Lasalle v. Vogel* (2019) 36 Cal.App.5th 127, 134.)

### TRUSTEE'S APPEAL

The Trustees sought treble or double damages ($1,485,000 or $990,000) pursuant to either Civil Code section 3345 or Probate Code section 859. In this appeal, they argue the trial court erred as a matter of law in refusing to impose double damages pursuant to Probate Code section 859. We need not address the merits of this argument because we have determined the judgment must be reversed and the matter remanded for new discovery proceedings and trial.

---

[15] In January 2020, the Trustees filed three motions to compel: (1) against Tahir to supplement a response to one FROG; (2) for Tahir to respond fully to a handful of RFAs; and (3) for the Mosque to respond to RFP. On March 11, 2020, the court ordered the Mosque to comply with these discovery requests and imposed a $5,780 sanction against it. Four months later, on July 1, 2020, it corrected the order.

40

DISPOSITION

The judgment is reversed and all discovery orders and discovery sanctions are vacated. The trial court's order striking Defendants' answer and its order granting the Trustees (plaintiffs') leave to amend are vacated. Thus, the FAP is stricken. We also vacate the order granting the preliminary injunction regarding the Property, understanding that due to the passage of time the parties may want the Property to remain in the Trust. If this is the case, the parties may enter a stipulation to keep the Property in the name of the Trust. The case is remanded to allow for discovery and a trial on the merits.

Respondents' May 22, 2023, motion to augment the record on appeal is granted. In the interests of justice, neither party shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.

41