[No. B163333. Second Dist., Div. Five. July 28, 2004.]

VERONICA OLIVEROS et al., Plaintiffs and Respondents, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

Counsel

Greines, Martin, Stein & Richland, Martin Stein, Alison M. Turner, and Dana Gardner Adelstein for Defendant and Appellant.

Robie & Matthai, James R. Robie, Edith R. Matthai, Natalie A. Kouyoumdjian; Stephan Oringher Richman & Theodora and Harry W. R. Chamberlain II for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Manuel Hidalgo, Manuel Hidalgo and Rolando Hidalgo for Plaintiffs and Respondents.

Dunn Koes, Pamela D. Dunn and Daniel J. Koes for Los Angeles County Bar Association as Amicus Curiae.

## Opinion

**ARMSTRONG, J.**—In this appeal, we are asked to determine whether the trial court erred in denying the request of defendant County of Los Angeles (County) for a trial continuance due to the engagement of its attorney in another trial. We conclude that it did, and so reverse the judgment.

### FACTS

Plaintiff Veronica Oliveros suffered a brain injury following open-heart surgery at Harbor General-UCLA Medical Center. Mrs. Oliveros and her husband, Jesus Oliveros (together, plaintiffs) filed the present action for medical malpractice, products liability, loss of services, and loss of consortium against the County, as well as individually named doctors and nurses.

Plaintiffs attribute Mrs. Oliveros's injuries to the County's negligence in failing to promptly replace her respiratory tube after it became dislodged the morning after her surgery. According to plaintiffs, Mrs. Oliveros's blood-oxygen level became dangerously low once the respiratory tube was removed, causing permanent brain damage. The County and its physicians contend that Mrs. Oliveros was already breathing on her own when the respiratory tube became dislodged. They attribute her brain damage to air bubbles introduced into her heart during surgery, which traveled to her brain, causing injury. They contend that this is a well-recognized risk of open-heart surgery, which they could not have prevented.

Prior to trial, the parties identified 43 trial witnesses, including 18 designated experts. All of the trial witnesses testified at pretrial depositions,

resulting in thousands of pages of deposition testimony. The parties estimated that the trial would last three weeks.

The County originally retained Alexander Cobb of Bonne, Bridges, Mueller, O'Keefe & Nichols to try this case. When Mr. Cobb retired from his law practice several months before trial, the County asked Mr. Cobb's partner, George Peterson, to try the case. Mr. Peterson had 25 years of trial experience, and had represented the County in several of its significant medical malpractice cases over the previous 15 years. In preparation for trial, Mr. Peterson devoted more than 250 hours to reviewing the voluminous medical records and deposition transcripts, and to meeting with the County's witnesses.

The complaint was filed on September 15, 2000. Trial was originally set for January 15, 2002. Deposition discovery was not complete by that date, however, so the County moved for a 45-day continuance, to which plaintiffs stipulated. The motion was granted and the trial was continued to March 5, 2002.

At a final status conference on February 25, 2002, Mr. Peterson advised the court that he was scheduled to begin trial in San Francisco Superior Court on March 4. Accordingly, Mr. Peterson asked that the trial be continued three to four weeks, "no more than that." Plaintiffs' counsel did not oppose the continuance, and in fact advised the court that he had become engaged in another matter that would require him to spend "all of March and much of April" in expert depositions. The court's first available trial date was in early July, and so the court continued the trial to July 9, 2002.

In addition to this case, Mr. Peterson had another case set for trial in Compton Superior Court the week of July 8: *Smith v. Booker* (Super. Ct. L.A. County, No. TC013580). *Smith* had been filed several months earlier than the present case. As explained in a declaration to the court, opposing counsel in the *Smith* case had advised Mr. Peterson well before July 8 that he would be in trial in another matter on that date, and would move to continue *Smith*. Consequently, Mr. Peterson did not anticipate a conflict with the present case. And indeed, at a final status conference on June 27, Mr. Peterson's colleague, Christopher Marshall, advised the trial court of the potential but unlikely conflict between *Smith* and *Oliveros*. However, on July 3, Mr. Peterson learned that the *Smith* plaintiff had associated a new trial attorney who thought he likely would answer ready for trial on July 8. The attorney did so, and the trial court ordered the parties to return the following day to begin trial. The court was aware of the conflict with *Oliveros*, but stated that *Smith* had priority because it was filed first.

When he learned of the likely conflict on July 3, Mr. Peterson's colleague immediately informed plaintiff's counsel. Mr. Peterson called plaintiff's counsel again on July 8 to confirm the start of the *Smith* trial. According to Mr. Peterson, plaintiff's counsel said that he had "no problem" with a request to continue this trial to the conclusion of *Smith*. Plaintiff's counsel denied that he responded "no problem" when learning of the proposed continuance. In his posttrial declaration, however, he did not say that he voiced any objections to or reservations about the prospective continuance.

On July 9, Mr. Peterson requested a continuance of the present case. He explained that the conflict between *Oliveros* and *Smith* was unexpected, and he asked the court to continue *Oliveros* to the conclusion of *Smith*. He indicated that the *Smith* trial had commenced and would last about two weeks.

The trial judge said that he was not inclined to grant the continuance and suggested that another lawyer in Mr. Peterson's office try *Oliveros*. Mr. Peterson explained that *Oliveros* initially had been handled by one of his partners who had retired several months earlier and no longer practiced law. All but one of his firm's other senior trial attorneys were in trial; the remaining attorney was on vacation in Europe. None of the firm's other lawyers had experience trying cases of the complexity of *Oliveros*. More importantly, no one other than Mr. Peterson had prepared to try the case. Thus Mr. Peterson suggested that it would be unfair to the client "to ask [new counsel] to suddenly step into a case cold."

The trial court disagreed, suggesting that an experienced trial lawyer could prepare to try this case, a jury trial with a three-week time estimate, in a few days. He then ordered: "[Y]ou pick one of [the lawyers in your office] and have them be here at 1:30 [this afternoon], and we'll start [the trial]." Alternatively, he said, he would give the County six days, to July 15, to seek an emergency writ from the Court of Appeal. He would not do any more because he believed that Mr. Peterson "take[s] too many cases." Although he sympathized with the County, the judge said that Mr. Peterson's inability to represent it at trial was "not my problem."

On July 15, before this court ruled on the writ petition, Mr. Peterson told the trial court that the *Smith* trial was ongoing and that he expected it to conclude in about a week. There still was no attorney in his office who was available and sufficiently experienced to try *Oliveros*. He reminded the court of the circumstances that precipitated the conflict in trial dates, saying "It isn't a matter, your Honor, in this case where simply trial dates collided and nobody did anything about it. . . . [I] expected that I was going to be available to try this case in your department on schedule."

Mr. Peterson suggested that, rather than punish the County by forcing it to trial without counsel, the court impose monetary sanctions on his law firm that were severe enough "to constitute a grave threat against this ever occurring again." That way, he said, "the client's interests would be protected, your Honor would feel that our office has been dealt with in a way that would discourage this behavior from occurring again, and Mr. Hidalgo's clients would have their day in court as well with the witnesses that they prefer." Mr. Peterson also offered to "remain uncommitted to any other courtroom except this one until you are ready for me. . . . I'll be sure I won't get into any other courtroom. I won't take a vacation, [I] won't leave town."

Gary Miller, principal deputy county counsel, also addressed the court. He said that the County had chosen Mr. Peterson to try *Oliveros* because of his exceptional skill as a trial lawyer. He emphasized that the County had invested significant resources preparing to try the case and that it could not prepare any other attorney to try the case on such short notice. Thus, he said, "It is a severe prejudice to us in the enormity of the damages that can be assessed in this case to send us into court without the attorney that we put before this court."

The judge again said that he was "sympathetic to the client position in this matter" but he refused to change his mind. According to the trial court, Mr. Peterson's "management practices cannot become my crisis. . . . Their problems cannot become my problems. I'm afraid, and I'm sorry that it's become [the County's] problem."

Following the court's ruling, Mr. Peterson asked to be excused to return to the *Smith* trial. The judge granted that request. He then immediately began hearing motions in limine. Jury voir dire and trial followed, without the presence of the County or its lawyers.

After plaintiffs presented four days of evidence, the trial court directed a verdict in their favor, as follows:

| | |
|---|---:|
| Past economic damages (Mrs. Oliveros) | $236,578 |
| Past noneconomic damages (Mrs. Oliveros) | $250,000 |
| Future economic damages (Mrs. Oliveros) | $11,822,274 |
| Loss of consortium (Mr. Oliveros) | $250,000 |
| TOTAL: | $12,558,852 |

The County timely moved to vacate the judgment and for a new trial, both of which motions were denied. The County timely appealed.

## DISCUSSION

On appeal, the County maintains that the trial court abused its discretion in refusing to continue the case and forcing the County to proceed to trial without counsel. We agree.

■ A motion for continuance is addressed to the sound discretion of the trial court. (*Link v. Cater* (1998) 60 Cal.App.4th 1315, 1321 [71 Cal.Rptr.2d 130].) However, " '[t]he trial judge must exercise his discretion with due regard to all interests involved, and the refusal of a continuance which has the practical effect of denying the applicant a fair hearing is reversible error. [Citations.]' " (*In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1169 [208 Cal.Rptr. 345].)

"Judges are faced with opposing responsibilities when continuances . . . are sought. On the one hand, they are mandated by the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.) to actively assume and maintain control over the pace of litigation. On the other hand, they must abide by the guiding principle of deciding cases on their merits rather than on procedural deficiencies. (*Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1085 [94 Cal.Rptr.2d 575].) Such decisions must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency. (Cf. *Cordova v. Vons Grocery Co.* (1987) 196 Cal.App.3d 1526, 1532, 1533 [242 Cal.Rptr. 605] [when evaluating dismissal of action for delay in prosecution, policy favoring expeditious administration of justice by compelling prompt and diligent prosecution of actions subordinate to policy favoring trial on merits].)" (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 398–399 [107 Cal.Rptr.2d 270].)

Here, the record is devoid of the balancing of these competing interests. When the trial judge first learned of Mr. Peterson's conflict, he immediately asked the name of Peterson's firm and the number of lawyers in it. When learning that the law firm consisted of approximately 80 lawyers, the judge then announced: "What I'm expecting is somebody from your firm better be down here to try this case. If Mr. Peterson died tomorrow, would that mean this case would have to go away? No one can try this case? Is that what you're telling me?" The judge then offered to trail the case for an hour so that a lawyer from Peterson's firm could "come down here and try this case." The judge then explained: "You probably heard all of these judicial guidelines for getting cases done. In September this case is two years old. It's already 18 months old. I'm supposed to have 98 percent of all my cases done within 18 months, 100 percent done within two years. So if this was filed 9/15/00,

9/15/02 is the two-year date. So I have to get this thing tried. [¶] So would you call up to Bonne, Bridges, somebody and somebody tell us who is going to try the case."

■ The trial court viewed the problem presented too narrowly. As the Court of Appeal in *Link v. Cater, supra,* 60 Cal.App.4th 1315, instructed, the court must look beyond the limited facts which cause a litigant to request a last-minute continuance and consider the degree of diligence in his or her efforts to bring the case to trial, including participating in earlier court hearings, conducting discovery, and preparing for trial. (*Id.* at pp. 1324–1325.) The *Link* court concluded that the worthy goal of disposing of cases expeditiously would not be met by "imposing the ultimate sanction of termination on diligent litigants who, due to unforeseen circumstances and reasonable excuse, fail to appear when ordered to do so." (*Id.* at p. 1326.)

We recognize, as did the courts in *Bahl v. Bank of America, supra,* 89 Cal.App.4th 389, *Estate of Meeker* (1993) 13 Cal.App.4th 1099 [16 Cal.Rptr.2d 825], *Link v. Cater, supra,* 60 Cal.App.4th 1315, *Wantuch v. Davis* (1995) 32 Cal.App.4th 786 [39 Cal.Rptr.2d 47], and most recently *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242 [9 Cal.Rptr.3d 821], that trial courts are under great pressure to expedite their case loads to achieve judicial efficiency. "But efficiency is not an end in itself. Delay reduction and calendar management are required for a purpose: to promote the just resolution of cases on their merits. (*Thatcher v. Lucky Stores*[, *supra,*] 79 Cal.App.4th 1081, 1085 [94 Cal.Rptr.2d 575]; Gov. Code, § 68507; Cal. Stds. Jud. Admin., § 2.) Accordingly, decisions about whether to grant a continuance or extend discovery 'must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency.' (*Bahl v. Bank of America*[, *supra,*] 89 Cal.App.4th [at pp.] 398–399.) What is required is balance. 'While it is true that a trial judge must have control of the courtroom and its calendar and must have discretion to deny a request for a continuance when there is no good cause for granting one, it is equally true that, absent [a lack of diligence or other abusive] circumstances which are not present in this case, a request for a continuance supported by a showing of good cause usually ought to be granted.' (*Estate of Meeker, supra,* 13 Cal.App.4th at p. 1105.)" (*Hernandez v. Superior Court, supra,* 115 Cal.App.4th at pp. 1246–1247.)

The trial court's decision in this case was missing the balance referred to in *Hernandez v. Superior Court.* It is undisputed that Mr. Peterson requested the continuance in good faith—he was unexpectedly engaged in trial in another courtroom in the same courthouse in which the trial court insisted that Mr. Peterson try this case. The judge in the other case declined

to continue it in the face of the conflicting trial dates because the case in her courtroom was the older of the two by several months. This was a complicated medical malpractice case in which the parties intended to present the testimony of 43 witnesses, 18 of whom were designated as experts, and in which substantial damages were at stake. Mr. Peterson had invested over 250 hours in preparing this case for trial. Mr. Peterson represented to the court that none of the lawyers in his office who had sufficient litigation experience to try this case were available to do so on the date set for trial, and detailed the matters in which they were engaged to the exclusion of this case. The judge's opinion notwithstanding, lawyers are not fungible. The court's suggestion that any person with a license to practice law, or at least one associated with a "big" law firm, could come to court without any preparation and try a complicated medical malpractice case in which the plaintiff was particularly sympathetic, yet liability was far from certain, belies an understanding of the subtleties of such litigation.

■ We note as well that, while the trial court chastised Mr. Peterson for losing control of his calendar and attempting to control the court's calendar, it is a fact of life that a trial lawyer's time is not his own. For while trial courts are under great pressure to manage large caseloads, so too are lawyers under equally great pressure "to juggle trials in two or more courts, each presided over by a judge who sometimes has to trail cases or otherwise upset the lawyers' efforts to manage their own calendars." (*Estate of Meeker*, *supra*, 13 Cal.App.4th at pp. 1105–1106.) Thus, the trial court was well off the mark in announcing that the scheduling conflict before him was "not my problem." To the contrary, because this scheduling conflict affected the administration of justice, it was indeed the judge's problem, and one that he was obligated to make every effort to address in a manner which ensured the just resolution of the case before him. In the absence of evidence of a lack of good faith, the trial court as well as counsel on both sides should acknowledge the scheduling difficulties that from time to time disrupt the flow of litigation, and consider reasonable solutions that satisfy the interests of all parties.

Here, for example, plaintiff's counsel argues that his clients' interests would have been prejudiced if the trial court had granted the continuance because one of his experts was expected to become unavailable to testify at the end of July and throughout the month of August. While this problem was genuine, there were solutions to it other than granting a directed verdict for the plaintiff. For instance, the court could have continued the case to a time when the expert would again be available, or could have permitted that the expert in question be examined by way of video deposition for presentation to the jury (with various restrictions, if deemed necessary, on the defendant's use of objections, the scope of cross-examination, etc.), or could have permitted plaintiff to designate a new expert on the pertinent subject matter.

Any expenses incurred as a result of the continuance, new expert designation, or videotaped testimony could be ordered to be paid by the defendant, the party responsible for incurring them.[1]

Several recent published appellate opinions have emphasized the need for trial courts, in ruling on a request for continuance, to bring a measure of understanding to their decisionmaking. (See, e.g., *Hernandez v. Superior Court, supra*, 115 Cal.App.4th 1242; *Lerma v. County of Orange* (2004) 120 Cal.App.4th 709 [15 Cal.Rptr.3d 609].) In each of the cited cases, the reasons for the continuance request was "to permit the plaintiffs to be represented by physically able counsel." (*Lerma v. County of Orange, supra*, at p. 717.) Both of these cases involved terminally ill counsel who died before their respective cases could be tried. "As stated in *Hernandez*, 'The death or serious illness of a trial attorney or a party "should, under normal circumstances, be considered good cause for granting the continuance of a trial date[.]" [Citation.]' (*Hernandez* at pp. 1247–1248.)" (*Lerma v. County of Orange, supra*, at p. 717.) While the death of trial counsel is a tragic occurrence which cannot be compared to counsel's absence due to a scheduling conflict, the two situations lead to precisely the same legal result: An utter lack of legal representation in court.[2] A civil litigant has a constitutional right to be represented by counsel at trial (*Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 925 [211 Cal.Rptr. 77, 695 P.2d 164], citing *Powell v. Alabama* (1932) 287 U.S. 45, 68–69 [77 L.Ed. 158, 53 S.Ct. 55]), a right which ought not to be abrogated simply because the trial court concludes that the litigant's counsel of choice "take[s] on too many cases."

We note as well that, in February 2003, Chief Justice Ronald M. George appointed a Blue Ribbon Panel of Experts on the Fair and Efficient Administration of Civil Cases,[3] which "developed three sets of proposals intended to improve the administration of civil cases and to promote a more flexible application of the rules relating to trial setting, continuances, and case

---

[1] Likewise, upon a proper showing, the trial court can order the defendant to reimburse plaintiffs for expenses incurred as a result of the delay in trying this case that are properly attributable to defendant.

[2] While the decision to have no one appear might seem questionable, the County had no practical alternative. To have someone unqualified and unprepared try the case would likely result in a costly exercise with few, if any, remedies. Moreover, it could very well constitute a breach of the Rules of Professional Conduct on the part of the hapless lawyer picked to sit at defense counsel table. (See, e.g., Rules Prof. Conduct, rule 3-110.)

[3] Pursuant to Evidence Code sections 452, 453 and 459, we take judicial notice of "SP03-10: Motions and Applications for Continuance of Trial (amend Cal. Rules of Court, rule 375; adopt rule 375.1; repeal Cal. Stands. of Jud. Admin., § 9)" and "SP03-11: Trial Delay Reduction, Differential Case Management, and Case Disposition Time Standards (adopt Cal. Rules of Court, rule 204 and amend rules 208 and 209; amend Cal. Stds. Jud. Admin., §§ 2 and 2.1 and repeal §§ 2.3 and 2.4)."

management." The Judicial Council adopted the Blue Ribbon Panel's recommendations. The Judicial Council repealed section 9 of the Standards for Judicial Administration, which had provided that "the necessity for the continuance should have resulted from an *emergency* occurring after the trial setting conference that could not have been anticipated or avoided with reasonable diligence and cannot now be properly provided for other than by the granting of a continuance." (former Cal. Stds. Jud. Admin., § 9, repealed Jan. 1, 2004, italics added.) The Judicial Council also revised the California Rules of Court, rule 375, as proposed by the Blue Ribbon Panel. The revised rule includes "a simpler list of the facts that may constitute good cause" for a continuance, including "[t]he proximity of the trial date," "[t]he length of the continuance requested," "[t]he prejudice that other parties or witnesses will suffer as a result of the continuance," "[t]he court's calendar," *and "[w]hether trial counsel is engaged in another trial."* (Cal. Rules of Court, rule 375(d), italics added.) These changes specify in the rules themselves examples of factual scenarios constituting good cause, which were previously set forth in section 9 of the Standards for Judicial Administration, while emphasizing that "the court must consider all the facts and circumstances that are relevant to the determination." (Cal. Rules of Court, rule 375(d).)

■ Here, the trial court did not consider all of the facts and circumstances relevant to a ruling on the County's request for a continuance, nor the specific factors enumerated in revised rule 375(d) or in (now repealed) section 9 of the Standards for Judicial Administration. Rather, the judge's reported comments suggest that the only factor he took into consideration, and which became the decisive factor in his ruling, was the impact of a continuance on the court's calendar. While this is a valid factor to be weighed with the other facts and circumstances presented, it cannot be the be-all and end-all. The court's failure to carefully balance all of the competing interests at stake, guided by the strong public policy in favor of deciding cases on the merits, constituted an abuse of discretion.

Finally, the trial court's decision was tantamount to a terminating sanction. The policy of expediting civil cases cannot "override, in all situations, the trial court's obligation to hear cases on the merits. [Citations.] Preventing parties from presenting their cases on the merits is a drastic measure; terminating sanctions should only be ordered when there has been previous noncompliance with a rule or order and it appears a less severe sanction would not be effective. [Citations.] Terminating sanctions should not be ordered as a first response when noncompliance is through no fault of the party. [Citation.]" (*Wantuch v. Davis, supra,* 32 Cal.App.4th at p. 795; see also *Link v. Cater, supra,* 60 Cal.App.4th at p. 1325.) In short, "The court abused its discretion in [imposing a terminating sanction] and refusing to grant a continuance when the imposition of a lesser sanction would have sufficed. [Citations.]" (*Link v. Cater, supra,* 60 Cal.App.4th at p. 1325.)

In summary, the County hired counsel to defend it in a lawsuit brought by a young wife and mother who suffered permanent brain damage while hospitalized for heart surgery at a County facility. Plaintiffs sought to prove that the injury occurred postoperatively, when County employees failed to intubate Mrs. Oliveros after she removed a respiratory tube, resulting in dangerously low oxygen levels. The County sought to establish that the damage was done during the surgery itself, was a well-known risk of open-heart surgery, and could not be prevented. Both the plaintiff's case and the County's defense relied heavily on the use of expert witnesses, 18 of whom were designated for trial. Plaintiff sought upwards of $13 million in damages. The outcome of the trial was anything but certain.

Due to a series of circumstances beyond his immediate control, the County's lawyer found himself engaged in trial in another courtroom on July 9, the trial date in this case. He sought a continuance, not because he was unprepared for trial, or because he sought a technical advantage by delaying trial, or for any other suspect reason. Rather, he was ordered to trial in another courtroom, and he could not be in two places at one time. Contrary to the judge's finding, the County presented good cause for a continuance. Again, we emphasize that, whatever counsel's shortcomings in managing his schedule, it is the rights of the client, not the lawyer, which are at stake here, and there is no showing that the County did anything to warrant the result reached in this case.

We reiterate the sentiments expressed in *Estate of Meeker, supra,* 13 Cal.App.4th 1099: "[W]e need to remember that all of us are here to serve the public and that this cannot be done when judges are inundated with fast-track statistics and cheerleader attitudes about case disposition numbers which never seem to take into account the rights of the parties. [¶] . . . Efficiency cannot be favored over justice. It follows necessarily that we do not believe appellants should have been deprived of their day in court." (*Id.* at p. 1106.)

## DISPOSITION

The judgment is reversed. The parties are to bear their own costs on appeal.

Mosk, J., concurred.

**TURNER, P. J.**—I respectfully dissent because: the trial court did not abuse its discretion when it granted a six-day continuance to allow defendant, one of the largest public entities in the nation, the opportunity to have its counsel, a large law firm which had chosen to set too many cases for trial, time to get ready to try the case (Gov. Code, § 68607; Cal. Rules of Court, rule 375 (amended Jan. 1, 2004); former Cal. Stds. Jud. Admin. § 9 (repealed Jan. 1, 2004); *Estate of Meeker* (1993) 13 Cal.App.4th 1099, 1105 [16 Cal.Rptr.2d 825]); defendant has failed to demonstrate a reasonable probability of a more favorable result had the case been further delayed (Cal. Const. art. VI, § 13; *People v. Sewell* (1978) 20 Cal.3d 639, 646 [143 Cal.Rptr. 879, 574 P.2d 1231] [failure to show a reasonable probability of a different result when a continuance was denied in a triple murder case]); defendant's inexcusable failure to even send a single lawyer to attend the trial forfeits all of their claims; and because defense counsel made the deliberate strategic decision not to appear at the trial, the trial court did not abuse its discretion in denying the request for relief under any of the provisions of Code of Civil Procedure section 473, subdivision (b). (*Yeap v. Leake* (1997) 60 Cal.App.4th 591, 602 [70 Cal.Rptr.2d 680]; *Ayala v. Southwest Leasing and Rental, Inc.* (1992) 7 Cal.App.4th 40, 44 [8 Cal.Rptr.2d 637].)