Filed 6/5/26  Alsaedi v. Westbrook CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MOHAMMED ALSAEDI et al., Plaintiffs and Respondents, v. JOSHUA WESTBROOK, Defendant and Appellant. | A170425 (City & County of San Francisco Super. Ct. No. CGC20585130) |

Joshua Westbrook appeals the judgment entered against him for personal injuries and loss of consortium plaintiffs Mohammed Alsaedi and Farqad Mahdi Obayes (collectively, plaintiffs) sustained in a collision involving vehicles driven by Westbrook and Alsaedi.  Westbrook contends the trial court prejudicially erred by (1) denying him a mid-trial continuance after one of his attorneys fell ill, (2) excluding evidence that Alsaedi's attorney referred Alsaedi to his treating physicians on a lien basis, and (3) admitting evidence that a police officer concluded Westbrook violated the Vehicle Code in connection with the collision.  We reject his contentions and affirm.

## I.  BACKGROUND

The collision occurred when Alsaedi was driving down a street in San Francisco.  Prior to the collision, Westbrook's vehicle was parked on the side

1

of the street. As Westbrook pulled his vehicle out of its parking spot, he collided with Alsaedi, causing Alsaedi's car to roll onto its side.

Alsaedi and Obayes, who is Alsaedi's wife, sued Westbrook for negligence and loss of consortium. Plaintiffs alleged that Westbrook negligently caused the collision and that Alsaedi suffered injuries in the collision that "will result in some permanent disability" to him.

At trial, both sides called several medical experts to testify as to the nature and extent of Alsaedi's injuries and whether the collision caused those injuries. The parties also called medical billing and vocational rehabilitation experts to testify regarding the reasonable costs of the medical treatment Alsaedi received for his injuries, the costs of his future medical care, and his "work-life" expectancy. Additionally, dashcam footage of the collision taken from Alsaedi's vehicle was played for the jury, as well as excerpts of the video depositions of the officer who investigated the collision and of four of the physicians who treated Alsaedi after the collision.

The jury found that Westbrook was negligent, that his negligence was a substantial factor in causing Alsaedi's harm, and that Alsaedi was also negligent. Polling of the jurors revealed, however, that the jury was deadlocked six to six on the issues of whether Alsaedi's negligence was a substantial factor in causing his harm and whether Obayes suffered a loss of consortium. As a result, the court instructed the jury to resume deliberating on comparative fault and loss of consortium.

The jury returned a new verdict, finding that Alsaedi was 10 percent at fault for the collision and that Obayes suffered a loss of consortium. The trial court subsequently reduced plaintiffs' damages by 10 percent.

After the trial court granted Westbrook's motion for remittitur, the court further reduced the jury's awards for past economic damages and

future lost earnings and entered a judgment awarding plaintiffs a total of approximately $4.18 million in damages.

## II. DISCUSSION

### A. Denial of Trial Continuance

Westbrook first challenges the trial court's decision to proceed with trial after his lead attorney, Mary Talmachoff, tested positive for COVID-19 and was unable to appear in court for four days of trial.

#### 1. Additional Facts

The first day of trial testimony occurred on December 21, 2023. Talmachoff, a law firm partner, was assisted at trial by Joel Knaack, an associate at Talmachoff's law firm.

On the morning of January 1, 2024, Talmachoff emailed the court that she had tested positive for COVID-19 and would have to quarantine through that Friday, January 5.

Although Talmachoff did not expressly request a continuance, Westbrook's counsel responded by urging the court to "deny the request for a continuance." He argued that Knaack "should take over the case," as Knaack "has been out of law school for over ten years, worked as a trial attorney in the JAG corps," and "prosecuted 13 felony-level courts-martial and drafted, argued, and opposed countless motions." He further noted that Knaack had second-chaired a "number of trials" while at Talmachoff's law firm and had competently examined several witnesses in this trial. Finally, he contended the court could permit Talmachoff to appear telephonically.

Knaack responded that he did "not have authority to take over this trial" because Talmachoff was lead trial counsel and Westbrook had the "right to the counsel of his choosing." Nonetheless, Talmachoff had

3

"authorized [Knaack] to be present for the playing of video depositions, and witnesses April Stallings and Jessica Chavez."

The following morning, in addressing Talmachoff's absence, the trial court noted that "Mr. Knaack has indicated that he can proceed forward with the direct examination of the expert witnesses. I agree that he certainly is capable of proceeding forward with the case." While the court acknowledged that the client "is the one that has some authority over who really is the lead counsel," Knaack had "approval for certain things, all of which [were] included" that day. The court further noted that Talmachoff could appear via Zoom and communicate with Knaack through email or text. The court said, "[W]e're going to fill all the days we can and proceed as much as possible for it." The court then asked Knaack if he had anything to add, to which Knaack responded "[n]ot at this time."

In the following two days of trial, Stallings, plaintiffs' friend, and the defense's vocational rehabilitation expert testified, and plaintiffs' counsel conducted the direct examination of plaintiffs. At the end of those two days of testimony, Talmachoff emailed the court that it was "impossible" to watch the trial via Zoom and provide assistance to Knaack because she did not have childcare. She also said Knaack would "be ready to proceed with defense witnesses Ashea Neil and John Glynn" the following day, but that she "must do the direct examinations for any further witnesses including" the defense's medical experts. She acknowledged the court's "desire to conclude the trial expeditiously" but was "concerned about the prejudice to [her] client through [her] absence."

The following morning, on January 4, the trial court addressed Talmachoff's request to conduct the direct examinations of the defense's medical experts when she returned from quarantine. The court said it was

4

concerned about "the hardship date" of January 10 and the fact that the length of trial had already "extended beyond what the jurors were prepared to give their time and service for." The court said that if Talmachoff did not test negative for COVID-19 by Monday, January 8, the defense should discuss whether Knaack could handle some of the parties' medical experts "to avoid a mistrial."

Plaintiffs' counsel added that Knaack was "listed on the pleadings for months and months" in this case and had participated "fully" in all pretrial proceedings, the presentation of evidence, and the cross-examination of witnesses. He further noted that Knaack had tried 15 felony trials in the "military courts." Knaack responded that he had tried criminal cases, not civil cases, he had been second chair in only one jury trial, and he had not conducted direct or cross-examination of experts prior to this case. He also claimed that the California rules of evidence were "significantly different" from the military rules of evidence.

The trial court ultimately concluded that Knaack had "been capable throughout the entire trial and can handle the case." The court declined to make a final determination as to whether Westbrook was entitled to the "actual" attorney of his choice because the parties needed to brief the issue. The court explained, "I don't know whether [Talmachoff] was directly approached by [Westbrook] or if [Westbrook] went to [Talmachoff's] firm and then [Talmachoff's] firm assigned her to the case." Knaack agreed to provide additional briefing regarding "the right to a specific counsel."

Neil and Glynn testified that day, and there was one witness, Leslie Fong, who testified the following day, which was a Friday. Talmachoff returned to court the following Monday.

## 2. *Analysis*

Westbrook argues that the trial court's denial of a four-day continuance was an abuse of discretion. Alsaedi disagrees that the trial court committed prejudicial error when it declined to stop trial for Talmachoff's illness and additionally argues that Westbrook forfeited his claim of error because he never expressly requested a continuance. Assuming without deciding that Westbrook preserved his claim for appellate review, we find no abuse of discretion.

"[C]ontinuances of trials are disfavored" and may be granted only upon "an affirmative showing of good cause requiring the continuance." (Cal. Rules of Court, rule 3.1332(c).) "A trial court has broad discretion in ruling on a motion for a continuance. [Citation.] It is the duty of the trial court to vigorously insist upon cases being heard and decided in the most timely manner possible, unless there are compelling reasons to the contrary." (*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal.App.3d 442, 456.)

Good cause may arise due to counsel's unexpected illness, but the court must consider all the relevant facts and circumstances, including the proximity of the trial date, whether there were prior continuances, the length of the requested continuance, the availability of alternative means to address the problem, prejudice to the parties, and whether the parties stipulated to the continuance. (Cal. Rules of Court, rule 3.1332(c), (d).)

Further, " ' "[t]he trial judge must exercise his discretion with due regard to all interests involved, and the refusal of a continuance which has the practical effect of denying the applicant a fair hearing is reversible error." ' " (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395 (*Oliveros*).) We review for an abuse of discretion. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984.)

The trial court acted within its discretion in denying a continuance based on the information provided at the time a possible continuance was discussed. First, while Westbrook now takes issue with the court's conclusion that Knaack could competently step in as lead counsel in Talmachoff's absence, Knaack and Talmachoff's only specific objection to proceeding with trial during Talmachoff's quarantine was that Westbrook was entitled to the attorney of his choosing. We see no error in the court proceeding with trial over this objection. There was no evidence that Westbrook did not consent to Knaack handling any of the witnesses who testified in Talmachoff's absence, Talmachoff expressly authorized Knaack to handle some of those witnesses, and it seems that Knaack did not brief the issue of whether Westbrook was entitled to the specific attorney of his choosing after being given the opportunity to do so. Moreover, neither Knaack nor Talmachoff objected to other witnesses testifying during her absence until the end of Talmachoff's second day of quarantine when Talmachoff told the court that she must conduct the direct examinations of all other witnesses aside from Neil and Glynn. Only one other witness, Fong, subsequently testified before Talmachoff's return, and she was called by the defense.

Second, the trial court could have reasonably concluded that Knaack could competently oversee the case in Talmachoff's absence. (See *Volkering v. Allen* (1950) 96 Cal.App.2d 804, 806–807 [no abuse of discretion in denying continuance for defense counsel's illness where another attorney made "an orderly and able presentation of the defendant's case"]; Cal. Rules of Court, rule 3.1332(d)(4) [factors courts must consider in ruling on motion for continuance include "[t]he availability of alternative means to address the problem that gave rise to the motion"].) Knaack had been second chair since the beginning of trial and his name was on pre-trial pleadings, indicating he

7

was familiar with the case. Moreover, the court had observed Knaack handle several witnesses by that point, and, based on those observations, it concluded Knaack was capable of proceeding with trial in Talmachoff's absence.

While Westbrook argues on appeal that Knaack's civil trial experience "paled in comparison" to that of Talmachoff's and that Knaack lacked familiarity with the case, no such concerns were raised until the third day of Talmachoff's quarantine, when Knaack told the court he had limited experience litigating civil trials and examining expert witnesses. Moreover, Knaack raised those concerns in the context of the court addressing the possibility that he would handle some of the expert medical witnesses should Talmachoff continue to test positive for COVID-19, a possibility that never came to fruition.[1] There was no suggestion that Knack was too inexperienced or incompetent to handle other witnesses or did not have sufficient familiarity with the case. In any event, the court had information from which it could conclude that Knaack was capable of proceeding with certain witnesses in Talmachoff's absence. " ' "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge." ' " (*People v. Diggs* (2022) 80 Cal.App.5th 702, 709.)

Finally, other factors in California Rules of Court, rule 3.1332(d) weighed in favor of denying the continuance. The request for a continuance

---

[1] We disregard the other evidence the parties rely on in support of their arguments because that evidence was not before the court at the time a possible continuance was discussed. We also disregard the unsupported factual assertions in Westbrook's reply brief.

occurred near the end of a weeks-long trial. (See Cal. Rules of Court, rule 3.1332(d)(1); *Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621, 631 [fact that "trial had already consumed four days" and "was nearing completion" supported affirming trial court's denial of continuance].) And the trial court had reason to believe that a four-day continuance might result in a mistrial. (See *Advantec Group, Inc.*, at p. 631; Cal. Rules of Court, rule 3.1332(d)(11).)

Citing *Oliveros*, *supra*, 120 Cal.App.4th 1389, Westbrook contends the trial court failed to balance its interest in maintaining the trial schedule against his interest in the "experienced counsel of his choosing." We find *Oliveros* distinguishable. There, the trial court denied a last-minute continuance for the sole reason the court had to comply with a court policy to bring cases to trial within two years. (*Id.* at p. 1395.) The appellate court reversed the judgment because the trial court did not balance the interests of resolution of the case on the merits and judicial efficiency, but instead single-mindedly focused on the court's policy. (*Id.* at p. 1396.) Here, in contrast, the presiding judge considered whether Knaack was capable of proceeding with trial in Talmachoff's absence and whether Westbrook was entitled to the attorney of his choice. In doing so, the court postponed the examination of certain witnesses until Talmachoff's return and considered rescheduling the testimony of other witnesses. Thus, the judge balanced the interests and did not consider only judicial efficiency.

*Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, another case relied on by Westbrook, is also distinguishable. In that case, the appellate court reversed the trial court's denial of the plaintiff's request to continue trial after the plaintiff's counsel died shortly before trial. (*Id.* at p. 1245.) In reaching this disposition, the appellate court noted that the plaintiff had to

9

" 'shop around' " for other attorneys after his counsel's death and was diligent in doing so.  (*Id.* at p. 1247.)  Thus, *Hernandez* does not address the situation where another attorney from the law firm retained by the plaintiff to represent him at trial was available to oversee the trial.  Accordingly, the trial court did not abuse its discretion in proceeding with trial in Talmachoff's absence.

## B. Exclusion of Impeachment Evidence

Next, Westbrook contends the trial court prejudicially erred by excluding evidence that Alsaedi's attorney referred Alsaedi to his treating physicians and that those physicians treated Alsaedi on a lien basis. Plaintiffs do not dispute the relevance of the excluded evidence (see *Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 808), but they contend Westbrook forfeited his claim of error by failing to make an offer of proof in the trial court identifying the specific physicians who were attorney-referred or provided lien-based care.  Plaintiffs further urge us to affirm the judgment on the ground that the excluded evidence was subject to attorney-client privilege.  We need not decide whether the trial court erred or whether Westbrook forfeited his claim of error because we conclude any error was harmless.

### 1. Additional Facts[2]

#### a. The Motion in Limine

Prior to trial, Alsaedi moved in limine to exclude "any evidence that [he] was referred to a doctor by an attorney or that he was treated on a lien." He argued this evidence was irrelevant and its probative value was

---

[2] The appellate record is lengthy, consisting of twenty-three reporter's transcripts and appendices of nearly one thousand pages.  Accordingly, we limit our recitation of the relevant facts to the portions of the record cited by the parties in their appellate briefs.

outweighed by the risk it would create undue prejudice to him and would be time-consuming and misleading to the jury.

At the hearing on the motion, the trial court asked Alsaedi's counsel whether Alsaedi was treated on a lien basis. Alsaedi's counsel said that "most of the doctors referred him on to the other doctors" and that "it's a mix of lien and non-lien treatment." He stated, "I believe there is one physician—one or two physicians that Mr. Fareed gave [Alsaedi] the name of."

Westbrook's counsel argued that the evidence was relevant because it concerned the testifying experts' motives and biases due to their financial incentives in the outcome of the trial. Alsaedi's counsel responded that the physicians "get paid regardless of the outcome"—"[it] is a bill that is due and owing, just like any other bill"—and so "it's speculative."

The trial court granted the motion without prejudice, noting that "circumstances . . . may change during the trial."

### b. *The Physicians' Testimony*

At least three of the physicians who treated Alsaedi after the collision, Drs. Andrew Fox, VanBuren Lemons, and Vinay Reddy, testified at trial. For two of the other physicians who treated Alsaedi, Drs. Frederick Hartker and Christopher Stephenson, excerpts of their video depositions were played to the jury. Westbrook contends these "treating physicians" are "lien-physicians" and treated Alsaedi based on referrals from Alsaedi's attorney. In addition to the treating physicians, Alsaedi's retained medical experts, Drs. Fernando Miranda and Edgar Angelone, testified at trial. There is no contention that Drs. Miranda and Angelone were attorney-referred or lien-physicians.

11

In summarizing the physicians' testimony, Westbrook's appellate briefing focuses on two types of injuries that Alsaedi allegedly suffered because of the collision, a brain injury and spinal injuries.

### i.     Alsaedi's Alleged Brain Injury

Dr. Miranda, a neurologist, testified that he administered tests on Alsaedi and reviewed studies, including magnetic resonance imaging (MRI) and diffusion tensor imaging (DTI), which revealed some abnormalities and "permanent demonstrable changes" in Alsaedi's brain. Based on his review of Alsaedi's medical records and his examination of Alsaedi, Dr. Miranda opined that Alsaedi's brain injury was likely caused by the collision.

Dr. Angelone, a neuropsychologist, testified that the post-collision scans of Alsaedi's head, including an electroencephalogram (EEG) scan, and the symptoms Alsaedi reported after the collision were "typical" of a traumatic brain injury. In examining Alsaedi, Dr. Angelone observed symptoms that were consistent with a traumatic brain injury, including sensitivity to light and noise, irritability, and memory problems. He concluded that Alsaedi suffered a brain injury in the collision that "will have an affect on his day-to-day activities as well as work."

Dr. Hartker, a neuroradiologist, testified that he reviewed an MRI of Alsaedi's brain taken after the collision, which he concluded showed abnormalities in the portions of Alsaedi's brain that were responsible for decision-making, emotional regulation, and high-level cognitive function. He opined that the abnormalities were likely the result of trauma.

Dr. Stephenson testified that Alsaedi's post-collision EEG scan showed "a significant reduction almost globally in the electrical activity of [Alsaedi's] brain" and "a significant delay in the processing of information in [his] brain."

He opined that these test results indicated that Alsaedi more likely than not suffered a "significant" brain injury in the collision.

Most of Westbrook's medical experts, Drs. Jerome Barakos, Elliot Henderson and Peter Cassini, disagreed that Alsaedi suffered a brain injury in the collision. Dr. Barakos, a neuroradiologist, and Dr. Cassini, a neurologist, both testified that they reviewed a post-collision "CT scan" of Alsaedi and found no indication of a head injury. Dr. Barakos further testified that Alsaedi's post-collision MRIs were normal. He said that DTI imaging did not have "utility when used on a single individual at one point in time."

Dr. Henderson, a neuropsychologist, administered several tests during an evaluation of Alsaedi, and the results of the tests indicated that Alsaedi was overreporting or exaggerating somatic, cognitive, memory, and emotional problems.

Dr. Scott Berta, the defense's expert neurosurgeon, testified that the collision was a substantial factor in causing Alsaedi's injuries. The injuries he concluded were related to the accident included a "mild traumatic brain injury."

### ii.    Alsaedi's Neck and Spine Injuries

Dr. Reddy, a physical medicine and rehabilitation doctor, began treating Alsaedi in 2019. After examining Alsaedi, Dr. Reddy concluded that Alsaedi had injuries to multiple cervical disks and "facet joints" as a result of the collision, and that Alsaedi's "L4-5 level" had herniated in the collision. He treated those injuries with epidural steroid injections to alleviate Alsaedi's pain.

Dr. Reddy further testified that Alsaedi was not a good candidate for surgery because he had "at least four disks that are abnormal," and the

success rate for a "four-level disk surgery" was low. Dr. Lemons, a neurosurgeon, agreed that "surgery [was] not going to be a good idea" because of the multiple abnormal disks in Alsaedi's spine.

In contrast to Drs. Reddy and Lemons, Dr. Fox recommended surgery on Alsaedi's spine because Alsaedi had "failed nonoperative care" and "continued to be symptomatic." Dr. Fox explained that an MRI showed that the "L4-5 level was the one causing [Alsaedi's] back pain" and was something he could fix surgically. Alsaedi eventually had the surgery, which resulted in "improvement in his symptoms compared to his preoperative status."

Finally, Dr. Berta diagnosed Alsaedi with "temporary" muscle strain that likely would have healed after a few months of treatment. He further testified that imaging studies showed Alsaedi had a herniated disc, but he did not know when that injury occurred. He said he would not have offered surgery for Alsaedi's back because the epidural injections appeared to have been working, and he did not know if the surgery was "absolutely necessary."

### c. The Billing Experts' Testimony

Alsaedi called Stallings, a medical billing expert, to testify regarding the reasonable value of Alsaedi's past and future medical expenses. For Alsaedi's past medical expenses, Stallings testified that there was an approximately $130,000 difference between the total amount Alsaedi's physicians billed for Alsaedi's treatment and the reasonable and customary rate of the treatment, which she calculated to be $273,270.16 "at the 80th percentile." In particular, Dr. Fox billed over $100,000, and Stallings concluded that the reasonable and customary amount was less than $15,000.

The defense's medical billing expert, Glynn, calculated a total of $229,787 for reasonable past medical bills at the 80th percentile. He explained that for several of Alsaedi's providers, including Dr. Fox, he found

14

instances of "double billing," and many of them did not submit bills with proper coding, making it difficult to determine the fair market value of the amounts billed.

### d. The Jury Verdict

By a vote of eleven to one, the jury apparently agreed with Stallings's calculation of past medical expenses because it awarded Alsaedi $273,270.16 in past economic damages. The verdict for future economic loss was by a vote of eleven to one and awarded Alsaedi over $1,700,000.

### 2. Analysis

Westbrook asserts that the exclusion of the attorney-referral and lien-based evidence was prejudicial because the evidence demonstrated that Alsaedi's treating physicians were financially incentivized to inflate their bills, overtreat Alsaedi, and link Alsaedi's injuries to the collision, issues that were contested at trial. He argues that the excluded evidence was "especially crucial" with respect to Dr. Fox, "who performed back surgery on Alsaedi despite the reservations of two other neurosurgeons who testified at trial."

A conviction may not be reversed based on the erroneous exclusion of evidence unless the error resulted in a miscarriage of justice. (Evid. Code, § 354; see *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 750 (*Ghebretensae*) [erroneous exclusion of impeachment evidence is evaluated under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836], disapproved of on another ground in *People v. Bryant* (2021) 11 Cal.5th 976, 986 & fn. 5.) "Under this standard, if a trial court erroneously excludes evidence, a defendant must show on appeal that it is reasonably probable he or she would have received a more favorable result had that evidence been admitted." (*Ghebretensae*, at p. 750.) Exclusion of impeachment evidence is harmless where the excluded evidence "would not have painted a materially

15

different picture of the witness's credibility." (*Id.* at p. 752; see *People v. Farley* (2009) 46 Cal.4th 1053, 1105, superseded by statute on another ground as stated in *People v. Garcia* (2022) 82 Cal.App.5th 956, 963–965.)

For a combination of reasons, Westbrook fails to demonstrate a reasonable probability that the excluded evidence would have changed the outcome of trial. First, to the extent Alsaedi's attorney referred Alsaedi to Drs. Hartker or Stephenson on a lien basis, it is highly unlikely the attorney-referral or lien-based evidence would have made a difference in the outcome of the case since those physicians' opinions were a relatively small part of trial and were consistent with those of Alsaedi's retained medical experts, Drs. Miranda and Angelone.[3] (See *People v. Mickle* (1991) 54 Cal.3d 140, 169 [exclusion of impeachment evidence was not prejudicial where witness "played a relatively minor role in the prosecution's otherwise strong circumstantial guilt case"].)

Second, Drs. Reddy and Lemons testified at trial that they believed Alsaedi was referred to them by other doctors, and Dr. Fox said he was "not sure" how Alsaedi became his patient. Westbrook has not cited any evidence in the record indicating that Alsaedi's attorney referred Alsaedi to these physicians other than the unsupported assertion in his counsel's declaration in support of his new trial motion that a "majority" of Alsaedi's treating physicians were attorney-referred.

Third, the exclusion of cumulative impeachment evidence is not prejudicial. (See *Ghebretensae*, *supra*, 222 Cal.App.4th at p. 752 [no prejudice from erroneous exclusion of impeachment evidence where "defense counsel

_____

[3] For example, the transcript for the testimony of Dr. Miranda spans over 150 pages, while the transcripts for the excerpts that were played at trial of Drs. Hartker and Stephenson's depositions together consist of approximately 30 pages.

16

attacked [the witness's] credibility in other ways"], disapproved of on another ground in *People v. Bryant*, *supra*, 11 Cal.5th at p. 986 & fn. 5; *People v. Farley*, *supra*, 46 Cal.4th at p. 1105 [same], superseded by statute on another ground as stated in *People v. Garcia, supra*, 82 Cal.App.5th at pp. 963–965; *People v. Mickle, supra*, 54 Cal.3d at p. 169 [exclusion of evidence harmless where witness's testimony "was susceptible of the same basic inferences as the proffered evidence" regarding whether the witness was trustworthy].) Here, the jury heard testimony that Alsaedi was paying Drs. Reddy, Lemons, and Fox substantial sums for their trial testimony and expert opinions regarding the injuries he sustained as a result of the collision. Dr. Lemons further indicated that Alsaedi had not yet paid him for his work on the case. Similarly, defense counsel elicited testimony from Dr. Reddy that Alsaedi owed him payment for medical treatment he provided Alsaedi. Defense counsel appeared to highlight this testimony in her closing argument by noting that Dr. Reddy "stands to be paid a significant amount of money for [Alsaedi's] . . . past treatment" if Alsaedi prevailed at trial. Thus, there was already evidence suggesting that Alsaedi's treating physicians may be biased in their testimony. (See Evid. Code, § 722, subd (b); *People v. Arias* (1996) 13 Cal.4th 92, 162 ["counsel is free to remind the jurors that a paid witness may accordingly be biased"].) On this record, the excluded evidence would not " 'have produced "a significantly different impression of [the witness's] credibility." ' " (*People v. Farley*, *supra*, at p. 1105.)

The reasonableness of the amounts the treating physicians billed for Alsaedi's treatment was also undermined by other evidence. Both parties' billing experts testified that the amounts billed by Alsaedi's physicians were significantly higher than the reasonable and customary amounts billed for the services they provided Alsaedi. There was also evidence that some of the

17

physicians, including Dr. Fox, engaged in double-billing.  The jury therefore had adequate facts independent of the treating physicians' motives to determine whether the physicians inflated their bills.  Indeed, the jury awarded Alsaedi his past medical expenses in an amount that was significantly reduced from that billed by his treating physicians.

Further, Westbrook acknowledges that both parties' medical experts agreed that Alsaedi suffered injuries to his neck and back in the collision.  In arguing that the exclusion of the lien-based evidence was prejudicial, Westbrook notes that Drs. Lemons and Reddy disagreed with Dr. Fox's recommendation to perform surgery on Alsaedi's spine.  Although true, we do not see how the lien-based evidence would have led to the jury reaching a different conclusion on whether the surgery was necessary if, as Westbrook asserts, Drs. Lemons, Reddy, and Fox all treated Alsaedi on a lien basis.

Westbrook also contends that one of the defense's medical experts disagreed with Alsaedi's experts on the extent of Alsaedi's injuries caused by the collision, pointing to Dr. Berta's testimony that Alsaedi suffered a temporary neck and muscle strain in the collision.  But Dr. Berta also testified that imaging studies conducted after the collision showed that Alsaedi had a herniated disc "at L4-5," which is consistent with Dr. Fox's testimony that Alsaedi's disk at the "L4-5 level" was the cause of his back pain.  Moreover, Dr. Berta did not offer an opinion as to whether the collision caused the herniated disc.  He also acknowledged that, according to the records he reviewed, Alsaedi "did get better from his surgery."  Thus, the evidence cited by Westbrook that supports a different outcome is weak relative to the evidence supporting the conclusion that Alsaedi suffered a serious back injury from the collision.  (See *People v. Beltran* (2013) 56 Cal.4th 935, 956 [in assessing prejudice, " 'an appellate court may

18

consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error' " complained of affected the result].)

Finally, it appears from Westbrook's appellate briefing that Alsaedi's *retained* medical experts testified extensively on the issue of whether Alsaedi suffered a traumatic brain injury in the collision, with short deposition excerpts from Drs. Hartker and Stephenson substantiating that testimony. Westbrook does not point to any relevant testimony from Drs. Lemons, Reddy, or Fox, while Alsaedi cites relatively brief testimony from Drs. Reddy and Lemons that also corroborated the opinions of Alsaedi's retained experts. Thus, the lien-based evidence likely would not have led to a different outcome on the issue of whether the collision caused Alsaedi to suffer a traumatic brain injury.

In view of the evidence admitted at trial, we conclude the excluded evidence "would not have painted a materially different picture" of the treating physicians' credibility (*People v. Mickle*, *supra*, 54 Cal.3d at p. 169) and was unlikely to lead to a different outcome at trial. The exclusion of the impeachment evidence was harmless error.

## C. Admission of Improper Testimony

Westbrook contends the trial court prejudicially erred in admitting the deposition testimony of the officer who investigated the collision, Chase McKay, that Westbrook was cited for violating Vehicle Code section 22106 and that this violation caused the collision.[4] Westbrook further argues that

---

[4] Westbrook filed a supplemental appendix consisting of additional excerpts from McKay's deposition and two pleadings filed in this case by Westbrook's counsel. Plaintiffs filed a motion to strike the supplemental appendix, contending that it includes materials that are immaterial or

Alsaedi's counsel compounded the prejudice in closing arguments by highlighting McKay's testimony that the sole "collision factor" was Westbrook's violation of Vehicle Code section 22106 and by referring to McKay's expertise as a police officer to suggest that McKay's conclusions "should be deemed dispositive on the issue of fault." We need not decide whether the trial court erred because we conclude any error was harmless.

Error in the admission of evidence is reversible only if it prejudiced Westbrook, i.e., if, after examining the entire cause, including the evidence, jury instructions, and arguments of counsel, "there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715; *People v. Wilkins* (2013) 56 Cal.4th 333, 351, superseded by statute on another ground as stated in *People v. Fisher* (2023) 95 Cal.App.5th 1022, 1027.) "There is a reasonable probability of a more

_____

cumulative, that were never presented in the trial court, and that should have been included in Westbrook's original appendix. Westbrook opposes the motion, arguing that the appendix was intended to correct misstatements made in plaintiffs' respondents' brief. He identifies two such misstatements, that McKay viewed the dashcam footage of the collision before writing his report and that Knaack's "name appeared on all the pleadings in the case." We disregard the latter alleged misstatement in the response brief as unsupported by citations to the record. We further conclude that the additional deposition excerpts are unnecessary to correct misstatements in the respondent's brief. Westbrook argued in his opening brief that Alsaedi's counsel "misrepresented McKay's testimony because McKay never testified that he watched the dashcam video before issuing the citation." The record speaks for itself on this point. Moreover, Alsaedi did not dispute this point in his respondent's brief. Rather, he argued that Westbrook's counsel failed to clarify the misrepresentations at the time they were made and that it is immaterial whether McKay watched the video. Accordingly, we grant the motion to strike. (See *Larner v. Los Angeles Doctors Hospital Associates, LP* (2008) 168 Cal.App.4th 1291, 1297, fn. 2, disagreed with on another ground in *Watkins v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1591.)

favorable result . . . when there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.' " (*People v. Mower* (2002) 28 Cal.4th 457, 484, superseded by statute on another ground as stated in *Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 958.)

Vehicle Code section 22106 prohibits a person from starting a stopped vehicle "until such movement can be made with reasonable safety." (Veh. Code, § 22106.)  In this case, the defense, in opening arguments, conceded that Westbrook was negligent by "fail[ing] to reasonably judge the distance that [Alsaedi's] vehicle was approaching from behind him before he pulled out of the parking spot and onto the road" and that Westbrook's negligence caused the collision.  Although the defense argued in closing arguments that Westbrook's negligence was only a "trivial" or "remote" cause of the collision, the defense still did not dispute that Westbrook was negligent when he pulled his car out of its parking spot.  Thus, there was no real dispute that Westbrook pulled into the street when it was unsafe to do so.

Further, by assigning Alsaedi 10 percent fault for the collision, the jury necessarily rejected McKay's testimony that Westbrook's violation of Vehicle Code section 22106 was the sole cause of the collision.

Westbrook nonetheless argues that McKay's inadmissible conclusions were prejudicial because they "skewed" the jury's apportionment of fault.  We disagree.  The defense's theory on comparative fault was that Alsaedi "had more than enough time to see [Westbrook's] vehicle and react appropriately" because Westbrook began pulling into the street five seconds before the collision.  McKay did not offer any testimony relevant to this theory of comparative fault.  That the jury found Alsaedi partly at fault for the

21

collision shows that the jury relied on other evidence and did not simply defer to McKay in evaluating fault.

Any prejudicial impact of McKay's deposition testimony was further dissipated by dashcam footage of the collision and jury instructions that "[e]very person has a right to expect that every other person will use reasonable care and will not violate the law" and that drivers must yield to the driver with the "right-of-way."[5] It was undisputed that Alsaedi had the right-of-way and therefore had a right to expect that Westbrook would yield to him. While the defense is correct that the dashcam footage shows Westbrook beginning to pull out of his parking spot approximately four to five seconds before the collision, the video also shows that Westbrook initially pulled out of his parking spot slowly, stopped, and then accelerated in approximately the last two seconds before the collision, thereby giving Alsaedi little time to react to Westbrook's failure to yield. The jury therefore had other evidence from which it could conclude that Westbrook's negligence was the primary cause of the collision. "Erroneously admitted evidence is harmless where it is cumulative or corroborative of other evidence." (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 546.) Thus, the dashcam footage, in light of the jury instructions, supports a determination of harmless error.

The authority Westbrook relies on, *Wilson v. Southern California Edison Co.* (2018) 21 Cal.App.5th 786, is distinguishable. In *Wilson*, a homeowner sued an electrical utility for nuisance and negligence due to "stray voltage" on her property. (*Id.* at p. 789.) After the jury found in favor of the plaintiff, the utility appealed, arguing in part that the trial court

---

[5] The jury was also instructed that even if someone has the right-of-way, "that person must use reasonable care to avoid an accident."

prejudicially erred in admitting evidence of "the prior history of stray voltage" on the plaintiff's property. (*Id.* at pp. 801, 808.) The reviewing court agreed that the trial court erred by admitting the evidence. (*Id.* at p. 808.) The appellate court further concluded that the error was prejudicial because the prior history of stray voltage on the plaintiff's property "was raised throughout the trial," plaintiff's counsel used the evidence in his closing argument to "ask[] the jury to send [the utility] a message through its verdict," and it was a "close case" since the jury was split nine to three on "key questions." (*Id.* at pp. 808–809.) The court concluded that it was reasonably probable that one or more additional jurors would have found in favor of the utility on those questions absent the challenged evidence. (*Id.* at p. 809.)

In contrast, here, there was no real dispute that Westbrook was negligent, and the jury's verdict was unanimous on that issue and the issue of whether Westbrook's negligence was a substantial factor in causing the collision. Although the jury was split nine to three on the comparative fault issue, it was split in Westbrook's favor on an issue for which he had the burden of proof. As such, this is not a case like *Wilson* where the erroneously admitted evidence may have "tipped the scales" in the prevailing party's favor. (See *Robinson v. Cable* (1961) 55 Cal.2d 425, 428.)

In sum, based on the parties' arguments, the evidence as a whole, and the jury instructions, we conclude any error in admitting McKay's deposition testimony at trial was harmless.

## D. Cumulative Error

Finally, we reject Westbrook's argument of cumulative error. Any asserted errors lack merit or are harmless. "[A] defendant is entitled to a fair trial, not a perfect one." (*People v. Anzalone* (2013) 56 Cal.4th 545, 556.)

23

In arguing that the cumulative effect of the trial court's errors requires reversal, Westbrook contends that certain inflammatory remarks that Alsaedi's counsel made during trial made "matters worse." Westbrook clarifies in his reply that this was not "a standalone claim of attorney misconduct" but was meant to "illustrate how Alsaedi's counsel repeatedly sought to prejudice the jury." In any event, we agree with Alsaedi that this argument was forfeited for Westbrook's failure to object. (See *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1061 [attorney misconduct claim forfeited for failure to object at time attorney made improper comments].)

## III. DISPOSITION

The judgment is affirmed.

_____
LANGHORNE WILSON, J.


WE CONCUR:


_____
HUMES, P. J.


_____
BANKE, J.


*Alsaedi v. Westbrook / A170425*